IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JESSIE J. BARNES,

                         Plaintiff,           Civil Action No.
                                      9:11-CV-0583 (NAM/DEP)

     v.

BRIAN FISCHER, *et al.*,

                         Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

JESSIE J. BARNES, *Pro Se*
09-B-2707
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      GREGORY J. RODRIGUEZ, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Jessie J. Barnes, a New York State prison inmate, has commenced this action against nineteen New York State Department of Corrections and Community Supervision ("DOCCS") employees pursuant 42 U.S.C. § 1983, alleging the deprivation of his civil rights. In his complaint, plaintiff claims a violation of his rights under the First, Eighth, and Fourteenth Amendments, arising from events stemming from two separate dates in 2010. Plaintiff also asserts a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1(a).

Currently pending before the court is a motion brought by defendants for the entry of summary judgment in their favor based on their contention that the record now before the court fails to establish a genuine dispute of fact as to whether any of plaintiff's claims have merit. Defendants alternatively argue that they are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion to dismiss be granted, except with respect to plaintiff's Eighth Amendment excessive force claim asserted against defendants Allen, Gravlin, Richardson, and Garrison.

## I.    <u>BACKGROUND</u>[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. He is, and was, at all times relevant to his claims in this action, confined in the Upstate

---

[1]    On August 5, 2013, the court received a submission from plaintiff entitled, "Statement Pursuant to Rule 7.1(a)(3)." Dkt. No. 153. On August 7, 2013, the court received a very large submission of papers from plaintiff that is styled as a cross-motion for summary judgment, but does not include a memorandum of law. Dkt. No. 154. On August 19, 2013, the court received plaintiff's memorandum of law. Dkt. No. 161. Had the court accepted those submissions as a cross-motion, it likely would have been forced to strike them due to the fact that it was over seven months tardy, *see* Text Order Dated Dec. 12, 2012 (extending dispositive motion deadline to January 31, 2012), and would have resulted in unfair prejudice to defendants, who timely filed their dispositive motion. Mindful, however, that the court is required to extend special solicitude to *pro se* plaintiffs (even those like plaintiff in this case who request (and are granted) multiple extensions to file a response to a motion and manage to timely file it only in light of the prisoner mailbox rule), I opted to construe plaintiff's submissions as his response to the pending motion. Text Order Dated Aug. 8, 2013. Having done so, I note that, although plaintiff opposed defendants' motion for summary judgment, he did not file an opposition to defendants' Local Rule 7.1(a)(3) statement of material facts that complies with Local Rule 7.1(a)(3). Specifically, defendants filed a nineteen-page statement of material facts containing one hundred and forty-five paragraphs, and satisfying the citation requirements of Local Rule 7.1(a)(3). Dkt. No. 111-1. In response, plaintiff filed a twenty-four-page statement of material facts that contains one hundred and fifty paragraphs, and neither admits nor denies any of the paragraphs contained in defendants' statement of material facts. Dkt. No. 153. Plaintiff was warned of the consequences of failing to properly respond to defendants' statement of material facts. Dkt. No. 111 at 3. The court therefore accepts the facts set forth in defendants' Local Rule 7.1(a)(3) statement to the extent that they are supported by accurate citations to the record. *See* N.D.N.Y. L.R. 7.1(a)(3) ("<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>" (emphasis in original)); *see also*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases and deeming all of the facts asserted in the defendant's statement of material facts as admitted where the plaintiff did not specifically admit or deny any of the assertions and "failed to contain a single citation to the record"). As to any facts that are not properly supported, in light of the procedural posture of the case, I have drawn all inferences and resolved all ambiguities in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

This case arises from two separate incidents, one occurring on August 21, 2010, and the second on October 12, 2010. On August 21, 2010, defendant Albert Gravlin, who is currently a sergeant employed with the DOCCS and was stationed at Upstate at the time, delivered and retrieved the Ramadan evening meal to plaintiff, a Muslim, at his SHU cell. Dkt. No. 111-3 at 24-26. Plaintiff contends that, before delivering his cold tray, defendant Gravlin crumbled the cookies on the tray and stuck his finger into the grapefruit. *Id.* After receiving the adulterated meal, plaintiff requested that defendant Gravlin's supervisor, defendant Laura Gokey, a DOCCS sergeant stationed at Upstate, replace the cold tray with a new one. *Id.* at 29. According to plaintiff's testimony at his deposition, defendant Gokey agreed to replace the cold try, leaving the hot tray of food for plaintiff, but never returned with a new cold one. *Id.*

After the meal was delivered, defendants contend that plaintiff refused to remove his arm from the "feed up hatch" attached to his cell[3] until

---

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined primarily for disciplinary reasons, for twenty-three hours each day. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002). (All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.)

[3]    A feed up hatch, which is properly named a "fixed protective hatch cover," is a steel and plexiglass box that opens from the top so that items can be placed in and also

defendant Gokey went to the cell and ordered him to remove his arms so that the hatch could be secured. Dkt. No. 129-1 at ¶ 7. At the end of the meal, defendant Gravlin went to plaintiff's cell to retrieve his tray; plaintiff, however, refused to return it and again placed his arms in the feed up hatch, refusing to remove them. Dkt. No. 111-4 at ¶ 7; Dkt. No. 129-1 at ¶ 9. Even after defendant Gravlin gave plaintiff a direct order to return his tray, plaintiff persisted.[4] Dkt. No. 129-1 at ¶ 10.

In response to plaintiff's conduct on August 21, 2010, defendant Gravlin issued an misbehavior report to plaintiff the next day, charging him with refusing to comply with a direct order and improper use of messhall utensils. Dkt. No. 111-4 at ¶ 9. In addition, it appears that defendant Gokey contacted defendant Matt Kelsh, a lieutenant employed by the DOCCS, to recommend that plaintiff be placed on a pre-hearing restricted diet. Dkt. No. 129-1 at ¶¶ 12, 13. On August 21, 2010, defendant Kelsh recommended that plaintiff be placed on a pre-hearing restricted diet for seven days, which was approved by defendant David Rock, the superintendent at Upstate. *Id.* (Exh. B) at 8.

On September 23, 2010, defendant Steven Bullis, a DOCCS

opens to the inmate's cell so the inmate can retrieve items from the box. Dkt. No. 129-1 at ¶ 5.

[4] A surveillance videotape captured these events; a copy of that videotape was submitted by defendants in support of their pending motion for summary judgment. Dkt. No. 111-4 (Exh. C) (traditionally filed, not electronically filed).

corrections officer, conducted a disciplinary hearing concerning the misbehavior report issued to plaintiff regarding the incident on August 21, 2010. Dkt. No. 1-2 at 15-42. In preparation for the hearing, defendant Melissa Cook, a corrections counselor employed by the DOCCS, was assigned to assist the plaintiff. *Id.* at 17. At the hearing, plaintiff was permitted the opportunity to call witnesses on his behalf, ask the witnesses questions relevant to the charges in the misbehavior report, and present evidence on his behalf. *See generally* Dkt. No. 1-2 at 15-42. At the conclusion of the proceedings, defendant Bullis found plaintiff guilty of the charges and sentenced him to an additional seven days restricted diet. *Id.* at 39-41.

In connection with the restricted diet sanctions issued against plaintiff as a result of the incident on August 21, 2010, defendant Hawk, a reverend employed by the DOCCS, advised plaintiff that the restricted diet superseded the Ramadan diet. Dkt. No. 1 at ¶¶ 33, 34; Dkt. No. 111-16 at ¶ 7. Plaintiff's complaint alleges that defendant Leonard, a former director of the Office of Ministerial, Family, and Volunteer Services for the DOCCS, and defendant Nuttall, a former deputy commissioner of program services for the DOCCS, provided this information to defendant Hawk, and defendant Hawk relied upon it in advising plaintiff. Dkt. No. 1 at ¶ 33, 34. According to Imam

Muhammad Ahmed, an DOCCS employee in the Office of Ministerial, Family, and Volunteer Services, the restricted diet, which consists of "the restricted loaf and shredded raw cabbage, is. . . halal [permissible] and is not in violation of the dietary restrictions of the Islam faith during Ramadan[.]" Dkt. No. 111-13 at ¶ 3.

The second incident giving rise to this action occurred on October 12, 2010, and involved the use of force against plaintiff by defendants Gravlin, Garrison, Richardson, and Allen.[5]  *See generally* Dkt. No. 1.  The record reveals that, in the afternoon of October 12, 2010, defendants Allen, Gravlin, and Richardson went to plaintiff's cell to escort him to the Upstate medical unit so he could have his weight and blood pressure checked.  Dkt. No. 111-3 at 59; Dkt. No. 111-4 at ¶ 13; Dkt. No. 111-14 at ¶ 5; Dkt. No. 111-15 at ¶ 5.  Plaintiff contends that on the way to the medical unit, defendant Gravlin twisted his handcuffs and verbally threatened him.  Dkt. No. 1 at ¶ 48; Dkt. No. 111-3 at 60.  Defendants, however, contend that, throughout the escort, plaintiff was loud and made threats against defendant Gravlin.  Dkt. No. 111-4 at ¶ 14; Dkt. No. 111-15 at 8.  Defendants maintain that, during the return

---

[5]       Defendants Spencer Garrison and Mark Richardson are corrections officers employed by the DOCCS, and were stationed at Upstate during the times relevant to this action.  *See generally* Dkt. Nos. 111-12, 111-14.  Defendant Timothy Allen is a sergeant corrections officer employed by the DOCCS assigned to the building in which plaintiff was housed on October 12, 2010.  Dkt. 111-15 at ¶ 4.

to plaintiff's cell, plaintiff was boisterous and uncooperative, and at some

point turned aggressively towards defendant Gravlin. Dkt. No. 111-4 at ¶ 16;

Dkt. No. 111-12 at ¶ 6; Dkt. No. 111-15 at ¶ 9. At that point, defendant Allen

ordered defendant Gravlin to turn plaintiff toward the wall. Dkt. No. 111-4 at

¶ 16; Dkt. No. 111-12 at ¶ 6; Dkt. No. 111-15 at ¶ 9. Plaintiff contends that

defendant Gravlin "rammed [him] into the wall, face first." Dkt. No. 111-3 at

63. Defendants argue that, because plaintiff began to struggle with

defendant Gravlin and continued to be disruptive after he was placed against

the wall, a retention strap was placed on the plaintiff's restraints. Dkt. No.

111-4 at ¶ 17; Dkt. No. 111-12 at ¶ 7; Dkt. No. 111-15 at 11. At this point,

defendant Allen ordered defendant Garrison, a DOCCS corrections officer, to

escort defendant Rosanna Lordi, a DOCCS nurse, to evaluate plaintiff. Dkt.

No. 111-14 at ¶ 5; Dkt. No. 111-15 at ¶ 10. When defendants Garrison and

Lordi arrived on the scene, plaintiff continued to be disruptive and

uncooperative, and defendant Lordi interpreted this behavior as a refusal for

medical treatment. Dkt. No. 112-1 at ¶¶ 4, 7.

Plaintiff was then returned to his cell by defendants Gravlin,

Richardson, Allen, and Garrison. Dkt. Nos. 111-4 at ¶ 18, Dkt. No. 111-12 at

¶ 7; Dkt. No. 112-1 at ¶ 6. Once he arrived at his cell, plaintiff was placed in

his cell, the cell door was secured, and the corrections officers attempted to

8

remove the retention strap and handcuffs.  Dkt. No. 111-4 at ¶ 18; Dkt. No. 111-15 at ¶ 11.  Plaintiff was instructed to keep both hands out of the feed up hatch so defendants could remove the restraints.  *Id.*  Plaintiff contends that, at this point, defendants Gravlin, Garrison, and Richardson all pulled the retention strap, which was still connected to plaintiff's handcuffs, towards them, and away from plaintiff's cell, allegedly causing plaintiff significant pain in his wrists and hands.[6]  Dkt. No. 111-3 at 71.  Defendants, however, maintain that, after they released plaintiff's right hand from the restraints, he tried to pull his left hand, along with the handcuffs, back into his cell, causing defendants to pull the restraints away from him.[7]  Dkt. No. 111-4 at ¶ 18; Dkt.

---

[6]    At his deposition, plaintiff described the retention strap as follows:

> Q.    All right. Tell me, what do they do with a retention strap, do you know how that works?
>
> A.    What they do is, they put you in your cell, they take the strap and they reach inside of the box and they grab the thing, you know, the black strap, it's got a loop around it and a slip knot, that is around the middle of the cuffs. So, you know, anybody – like a leash or something, you know, like a dog chain, so anybody that is like in that position, a human being is vulnerable, there is nothing you can do with your hands behind your back.

Dkt. No. 111-3 at 69.

[7]    A surveillance videotape at Upstate capturing the use of force incident on October 12, 2010, was submitted by defendants in support of their motion.  Dkt. No. 111-4 (Exh. D) (traditionally filed, not electronically filed).  Plaintiff has accused defendants David Mattoon and Rick Caron, both of whom are electronic equipment managers employed by the DOCCS, of tampering with and modifying the surveillance videotape that captured the events on that date.  Dkt. No. 111-3 at 51-52.

No. 111-12 at ¶ 8; Dkt. No. 111-14 at ¶ 6; Dkt. No. 111-15 at ¶ 11.

Plaintiff was seen by the medical staff at Upstate on October 13, 14, 15, 17, 18, 19, 22, and 23, 2010.  Dkt. No. 112-1 (Exh. C) at 40-44.  He complained of wrist and/or hand pain on four of those occasions, *id.*, though the parties dispute whether the pain was caused by the use of force applied against plaintiff by defendants Gravlin, Richardson, and Garrison.  Plaintiff's medical records do not indicate that, on any of those four occasions, medical personnel noted any abnormality, swelling, or decrease in range in motion.  *Id.*

## II.      PROCEDURAL HISTORY

Plaintiff commenced this action on May 25, 2011, by the filing of, *inter alia*, a complaint and an accompanying application to proceed *in forma pauperis*.  Dkt. Nos. 1, 2.  Plaintiff's complaint names nineteen defendants including, (1) Brian Fischer, the former commissioner of the DOCCS; (2) John Nuttall, a retired deputy commissioner of program services for the DOCCS; (3) Cheryl Morris, DOCCS's director of Ministerial, Family and Volunteers Services; (4) Mark Leonard, a retired director of the Office of Ministerial Family and Volunteer Services for the DOCCS; (5) Steven Bullis, a DOCCS corrections officer; (6) David A. Rock, the superintendent at Upstate; (7) Donald Uhler, the deputy superintendent of security at Upstate; (8) Matt

Kelsh, a lieutenant corrections officer for the DOCCS; (9) Laura Gokey, a sergeant corrections officer for the DOCCS; (10) Timothy Allen, a sergeant corrections officer for the DOCCS; (11) Mark Richardson, a corrections officer for the DOCCS; (12) Spencer Garrison, another DOCCS corrections officers; (13) Timothy Hawk, a reverend employed by the DOCCS; (14) Melissa Cook, a corrections counselor for the DOCCS; (15) David Mattoon, an electronic equipment mechanic for the DOCCS; (16) Rick Caron, an electronic equipment mechanic for the DOCCS; (17) Rosanna Lordi, a nurse practitioner employed with the DOCCS; (18) Albert Prack, the director of Special Housing Units for the DOCCS; and (19) Albert Gravlin, a sergeant corrections officers for the DOCCS. Dkt. No. 1 at ¶¶ 5-17.

Liberally construed, plaintiff's complaint asserts Eighth Amendement conditions of confinement, Eighth Amendment excessive force, Eighth Amendment deliberate medical indifference, Fourteenth Amendment due process, First Amendment retaliation, First Amendment free exercise, supervisor liability, and RLUIPA causes of against defendants. *See generally id.* Specifically, plaintiff asserts (1) an Eighth Amendment conditions of confinement claim against defendants Gravlin, Gokey, and Fischer; (2) an Eighth Amendment excessive force claim against defendants Gravlin, Richardson, Garrison, and Allen; (3) an Eighth Amendment deliberate

medical indifference claim against defendant Lordi; (4) a Fourteenth

Amendment due process claim against defendants Cook, Fischer, Rock,

Kelsh, Gokey, Gravlin, Rock, Morris, Nuttall, Hawk, Caron, Mattoon, and

Bullis; (5) a First Amendment retaliation claim against defendant Gravlin; (6)

a First Amendment free exercise claim against defendants Hawk, Nuttall, and

Leonard, (7) an RLUIPA claim against defendants Hawk, Nuttall, and

Leonard, and (8) a supervisor liability claim against defendants Fischer,

Uhler, and Prack. *Id.* As a result of the defendants' conduct alleged in his

complaint, plaintiff alleges he suffered physical and emotional injuries,

including nerve damage to both wrists, pain, and weight loss. *Id.* at ¶¶ 35,

49. He seeks declaratory and monetary relief, as well as attorney's fees and

costs. *Id.* at 19.

    Following the close of discovery, all of the defendants, except

defendant Prack, filed a motion seeking the entry of summary of judgment

dismissing all of plaintiff's claims against them.[8] Dkt. No. 111. Defendants

argue that dismissal is appropriate because, based on the record evidence,

no reasonable factfinder could conclude that they are liable for the claims

asserted against them. Dkt. No. 111-2 at 5-12, 21-39. In addition, as it

---

[8]     Because the docket sheet in this case does not reflect an acknowledgment
of service by defendant Prack, and the New York State Office of the Attorney General has
not received a request for representation by that defendant, he is not included in
defendants' motion. Dkt. Nos. 91, 111-2 at 4.

relates to some defendants, they argue that the record does not reveal a genuine dispute of fact as to whether they were personally involved in the alleged constitutional violations, as required for section 1983 claims. *Id.* at 13-21. Finally, in the alternative, defendants argue that they are entitled to qualified immunity from suit. *Id.* at 39-43. As was previously noted, plaintiff filed various submissions in opposition to defendants' pending motion between August 5 and 19, 2013. Dkt. Nos. 153-57, 160-61, 163.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *Bldg. Trades Employers' Educ. Ass'n v. McGowan*,

311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   <u>Plaintiff's Eighth Amendment Conditions of Confinement Claim</u>

In his complaint, plaintiff asserts an Eighth Amendment conditions of confinement claim against defendants Gravlin, Gokey, and Fischer, all arising from separate allegations. As it relates to defendant Gravlin, plaintiff alleges that he crumbled the cookies on plaintiff's meal tray "into dust" and pushed his thumb into plaintiff's grapefruit, rendering his food inedible on August 21, 2010. Dkt. No. 1 at ¶ 22. Regarding plaintiff's claim against defendant Gokey, it is alleged that she failed to intervene and replace plaintiff's meal after learning that defendant Gravlin tampered with plaintiff's meal on August 21, 2010. *Id.* at ¶ 28. Finally, as it relates to defendant Fischer, it is alleged that he imposed upon plaintiff the pre-hearing restricted diet. *Id.* at ¶¶ 38, 46.

1.   <u>Legal Standard Governing Eighth Amendment Conditions of Confinement Claims</u>

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356

U.S. 86, 100-01 (1958); *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)).  While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones."  *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and subjective requirement. *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).  As to the objective requirement, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs,'" *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 2985)); *see also Walker v. Schult*, 717 F.3d. 119, 125 (2d Cir. 2013) ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.").  As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference,'" *Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *see also Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).  Deliberate indifference exists if an official "knows of and

disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Waldo*, 1998 WL 713809, at *2; *Davidson v. Coughlin*, 920 F. Supp. 305, 308 (N.D.N.Y. Mar. 19, 1996) (McAvoy, J.).

> ### 2.   Analysis
>
> #### a.   Defendants Gravlin and Gokey

Plaintiff maintains that defendants Gravlin and Gokey caused him to miss one of his meals on August 21, 2010, after defendant Gravlin tampered with his food by crumbling his cookie into dust and inserting his finger in a grapefruit, and then defendant Gokey refused to replace the meal after learning of defendant Gravlin's conduct.  Dkt. No. 1 at ¶ 22, 28.  At his deposition, plaintiff testified that defendant Gravlin tampered with his food "because [defendant Gravlin] had the sole motive and intent to interfere with [plaintiff's] right to Ramadan[.]"  Dkt. No. 111-3 at 25.  He further testified that, although defendant Gokey initially agreed to replace his cold tray of food, which included the cookie and grapefruit, she never returned to plaintiff's cell with a replacement.  *Id.* at 29-30.  It appears, however, that plaintiff retained the hot tray that had been delivered to his cell.  *Id.* at 30 ("And the grapefruit, [defendant Gokey] took the cold tray with the crushed up

cookie, she took that out, I had the hot tray.").

Even assuming that defendants Gravlin and Gokey's conduct, as alleged by plaintiff on August 21, 2010 in connection with his meal at sundown, caused him to miss a full meal (which appears contrary to plaintiff's deposition testimony that indicates he was given a hot tray of food to eat that was not taken away by defendant Gokey), such conduct does not give rise to a cognizable constitutional claim. *See McDonald v. Rivera*, No. 06-CV-0410, 2008 WL 268345, at *8 (N.D.N.Y. Jan. 30, 2008) (Kahn, J., *adopting report and recommendation by* Peebles, M.J.) ("Turning to the plaintiff's assertion that he was denied one meal and participation in a single recreation period, these alleged actions, while not necessarily condoned. . . nonetheless are not sufficiently grievous to support an Eighth Amendment cruel and unusual punishment claim."); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (Peebles, M.J.), *report and recommendation adopted by Gill v. Hoadley*, No. 01-CV-0323, Order (Dkt. No. 68) (Scullin, J.) (finding that the plaintiff's allegations of, *inter alia*, one missed meal "are simply insufficient to establish a claim of cruel and unusual punishment"). Accordingly, I recommend that the Eighth Amendment conditions of confinement claim be dismissed against defendants Gravlin and Gokey.

## b. Defendant Fischer

Liberally construing plaintiff's complaint, it asserts a conditions of confinement claim against defendant Fischer as a result of allegations that he imposed upon plaintiff the pre-hearing restricted diet. *See* Dkt. No. 1 at ¶ 46 ("Defendant B. Fischer['s] continuous implementation of the . . . seven day[] pre-hearing 'restricted diet' upon the plaintiff . . . subjected the plaintiff to cruel and unusual punishment of being forced to consume outdated, undated, freezer burned, dry rot[], no variety, unwholesome 'restricted diet' bread[.]"). It is undisputed that plaintiff was placed on a restricted diet between August 22 and 28, 2010, as a result of the recommendation by defendant Kelsh. Gokey Decl. Exh. B (Dkt. No. 129-1) at 8. There is nothing in the record, however, aside from the allegations in plaintiff's complaint, that suggests defendant Fischer imposed the diet, or indeed had any involvement in the decision to impose it upon plaintiff. Plaintiff's allegation, unsupported and contradicted by the record evidence, is not sufficient to give rise to a dispute of fact as to whether defendant Fischer was personally involved in the asserted constitutional violation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[M]ere conclusory

allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case.").[9] Accordingly, I recommend that plaintiff's Eighth Amendment conditions of confinement claim asserted against defendant Fischer be dismissed.

### C. Plaintiff's Eighth Amendment Excessive Force Claim

Plaintiff's complaint asserts an Eighth Amendment excessive force claim against defendants Gravlin, Richardson, Garrison, and Allen arising from allegations that defendant Gravlin twisted plaintiff's handcuffs during an escort at Upstate on October 12, 2013, and defendants Gravlin, Richardson, and Garrison attempted to pull plaintiff out of his cell's feed up hatch with a retention strap after returning plaintiff to his cell.  Dkt. No. 1 at ¶¶ 48, 49.  It is further alleged that defendant Allen failed to intervene to stop the other defendants when they attempted to pull plaintiff through his feed up hatch. *Id.* at ¶ 50.

#### 1. Legal Standard Governing Eighth Amendment Excessive Force Claims

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which, as explained above in part III.B.1. of this report, prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the

---

[9]     The additional allegations related to defendant Fischer's supervisor liability will be addressed below in part III.H. of this report.

progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle*, 429 U.S. at 102-03.  As was also explained above, "[a] claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright*, 554 F.3d at 268.  To satisfy the subjective requirement in the context of an excessive force claim, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Id.* (quotation marks omitted).  This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a

21

finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is

true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

Given the fact-specific inquiry required to address the controlling objection and subjective elements, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim on a motion for summary judgment is inappropriate. *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")).

2. <u>Analysis</u>

Although in support of their motion defendants rely primarily on plaintiff's ambulatory health records and the use of force reports completed by defendants following the incident, they generally ignore plaintiff's deposition testimony and the surveillance video that recorded the incident at Upstate. Dkt. No. 111-2 at 28-32. A careful review of the entire record gives rise to a dispute of fact as to whether defendants used force in a malicious and sadistic manner for the very purpose of causing harm, or whether the force was used in an effort to restore discipline. Supporting plaintiff's version of events is his deposition testimony wherein he testifies that from the time defendant Gravlin began the escort of plaintiff to the medical unit to have his weight checked, he twisted plaintiff's handcuffs and taunted him. Dkt. No. 111-3 at 60, 62, 67. Plaintiff also testified that, after the retention strap had been secured, he was escorted to his cell, requested to put his hands through the feed up hatch so defendants could remove the strap and handcuffs, but instead, defendants pulled the retention strap towards them as if in an attempt to pull plaintiff out of his cell. *Id.* at 70-71. Although the declarations submitted by defendants Allen, Gravlin, Garrison, and Richards all explain that such use of force was necessary because plaintiff attempted to pull the handcuffs and retention strap into the cell with him after the

restraint on his right hand was released, *see*, *e.g.*, Dkt. No. 111-4 at ¶ 18, plaintiff disputes such version of the events when he testified that defendants were only "being abuse," Dkt. No. 111-3 at 71. The video surveillance does not depict the event in sufficient detail for the court to determine which version to credit. Gravlin Decl. Exh. D (Dkt. No. 111-4) (traditionally filed, not electronically filed). Instead, the video only shows, from a distance, defendants pulling some unidentified object away from plaintiff's cell. *Id.* Additionally, it does not reveal what is happening inside of the cell. *Id.*

In their memorandum of law, defendants appear to argue that summary judgment dismissing this claim is warranted based on a comparison of plaintiff's medical records to his apparent hyperbolic description of the events. *See* Dkt. No. 111-2 at 31-32 ("If plaintiff's head had been slammed against the wall with enough force to sound like a 'car wreck' and to have caused plaintiff to suffer a concussion . . . he would have received indisputable injuries. . . . As set forth above, the [plaintiff's medical] record reflects that plaintiff experienced no such injuries."). This ignores the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. The dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. Based on the record now before the court, there exists a

dispute of fact as to the reasoning for defendants' use of force, most specifically when they pulled the restraints off of plaintiff after he had returned to his cell. Accordingly, I recommend that defendants' motion be denied in connection with this claim.[10]

### D. Plaintiff's Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff's complaint asserts an Eighth Amendment deliberate medical indifference claim against defendant Lordi arising from allegations that she "deni[ed plaintiff] of medical care and falsifi[ed]" his medical records. Dkt. No. 1 at ¶ 51.

---

[10]    To the extent defendants argue that plaintiff's excessive force claim asserted against defendant Allen, which is based on a failure-to-intervene theory of liability, should be dismissed because "[d]efendant Allen did not observe anyone involved in this incident use force that he considered to be excessive," Dkt. No. 111-2 at 34-35, I find that argument unpersuasive. As defendants emphasize in their memorandum of law, one of the ways a defendant may be liable under a failure-to-intervene theory of liability is where he "'had a realistic opportunity to intervene and prevent the harm[.]'" *Id.* at 35 (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988). Here, it is undisputed that defendant Allen was present during the incident giving rise to the excessive force claim, and that he was part of the group of officers escorting plaintiff to and from the medical unit. Dkt. No. 111-15. It follows that, in the event a factfinder concludes that defendants Gravlin, Garrison, and Richardson used force in a malicious and sadistic manner against plaintiff during an escort in which defendant Allen participated, the same reasonable factfinder could conclude that defendant Allen, who was present at the time of the use of force, had an adequate opportunity to intervene, giving rise to liability.

2. <u>Legal Standard Governing Eighth Amendment Deliberate Medical Indifference Claims</u>

The protections afforded to prisoners by the Eighth Amendment include a mandate that the government "provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright*, 554 F.3d at 268; *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that

the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden*, 186 F.3d at 262. "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *accord*, *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

   2.   Analysis

Plaintiff's deliberate medical indifference claim arises from defendant Lordi's alleged denial to treat plaintiff following plaintiff's physical altercation on October 12, 2010, with defendants Gravlin, Garrison, Richardson, and Allen. *See generally* Dkt. No. 1 at ¶ 51; Dkt. No. 111-3 at 75. "The first inquiry is whether the prisoner was actually deprived of adequate medical

care." *Salahuddin*, 467 F.3d at 279-80. Although plaintiff alleges that he was provided no medical care at all following the incident, the record overwhelmingly indicates otherwise. The video surveillance depicting the use of force incident on October 12, 2010, shows defendant Lordi walking towards plaintiff's cell, with defendants Gravlin, Allen, and Richardson standing outside of it. Gravlin Decl. Exh. 4 (Dkt. No. 111-4) (traditionally filed, not electronically filed). Defendant Lordi submitted a declaration in which she states that she attempted to evaluate plaintiff immediately after the altercation with defendants Gravlin, Garrison, Richardson, and Allen, but plaintiff was uncooperative, conduct which defendant Lordi construed as plaintiff's refusal of medical treatment. Dkt. No. 112-1 at ¶ 7. I note, moreover, that the medical records support defendant Lordi's statement. Dkt. No. 112-1 (Exhs. A, D) at 8, 40.

In connection with any allegation that plaintiff was refused medical treatment after October 12, 2010, plaintiff's medical records belie that allegation. Specifically, plaintiff's medical records demonstrate that he was seen by medical staff on twelve occasions between October 13 and 23, 2010. Dkt. No. 112-1 (Exh. D) at 40-44. In light of all of this evidence contradicting plaintiff's allegation that he was denied all medical care for his injuries arising from the use of force incident October 12, 2010, and given the absence of

any evidence supporting plaintiff's allegation that he was denied all treatment, I find that no reasonable factfinder could conclude plaintiff was denied medical treatment by defendant Lordi on or after October 12, 2010 for injuries arising on that date. Accordingly, I have proceeded to inquire into whether there is a genuine dispute of fact as to whether the care provided was inadequate.

Plaintiff's medical records surrounding the date of October 12, 2010, indicate that, prior to his altercation with defendants Gravlin, Richardson, Garrison, and Allen, he had complained for months of hand and/or wrist pain. *See generally* Dkt. No. 112-1 (Exh. D) at 13-44. Specifically, plaintiff complained to medical personnel of hand or wrist pain on sixteen occasions between August 1, and October 12, 2010, including complaining that his right hand was numb on the morning of October 12, 2010, before the incident involving defendants Gravlin, Richardson, Garrison, and Allen. *Id.* at 13-39. At no time did medical personnel note any swelling, decrease of range of motion, or abnormalities. *Id.* Plaintiff refused ibuprofen, but his prescription Ultram, a pain medication he had already been taking, was continued. *Id.* In addition, medical personnel prescribed cold compresses and advised plaintiff to rest. *Id.*

Generally, after the incident on October 12, 2010, plaintiff's complaints

in connection with his hands and wrists did not change. For example, on October 13, 2010, medical records show that plaintiff complained of bilateral wrist pain, but no deformity or decrease of range of motion was noted. Dkt. No. 112-1 (Exh. B) at 40. He was advised to continue taking Ultram and to use compresses. *Id.* Plaintiff was seen by medical personnel again on October 15, 2010, complaining of bilateral hand pain, but no swelling or bruising was noted. *Id.* at 41. On that occasion, medical personnel issued Tylenol. *Id.* Similar medical attention was provided to plaintiff at least through October 23, 2010, *id.* at 44, and plaintiff testified his wrist pain stopped all together five months after the incident on October 12, 2010, Dkt. No. 111-3 at 80. Although plaintiff testified that he suffered pinched nerves in his wrists, none of his medical records support that testimony. *Compare id. with* Dkt. No. 112-1 at 13-44. For these reasons, and after a careful review of all of the record evidence in this case, including plaintiff's deposition testimony, I find that no reasonable factfinder could conclude that defendant Lordi, or any other medical provider at Upstate, provided inadequate medical treatment to plaintiff in connection with his injuries on October 12, 2010.

As it relates to the subjective element of the deliberate medical indifference analysis, there is no record evidence to support a finding that defendant Lordi "fail[ed] to act while actually aware of a substantial risk" of

serious harm to plaintiff.  Not even plaintiff's own allegations or deposition

testimony suggest that he was at risk for serious harm.  Indeed, he testified

that whatever wrist pain he may have felt as a result of the combination of

force used against him by defendants Gravlin, Richardson, Garrison, and

Allen and defendant Lordi's inadequate treatment disappeared after five

months and he experiences no residual pain or discomfort.  Dkt. No. 111-3 at

80, 97.  In light of all of this evidence, I find that no reasonable factfinder

could conclude that the evidence in this case satisfies the subjective element

of the Eighth Amendment medical indifference analysis.  Accordingly, I

recommend that this claim be dismissed.

     E.   <u>Plaintiff's Fourteenth Amendment Due Process Claim</u>

     Plaintiff's complaint asserts a Fourteenth Amendment due process

claim against defendants Cook, Fischer, Rock, Kelsh, Gokey, Gravlin, Rock,

Morris, Nuttall, Hawk, Caron, Mattoon, and Bullis arising from four separate

instances.  As it relates to defendant Cook, plaintiff alleges that she failed to

preserve the surveillance videotape of defendant Gravlin's delivery of his

meal to plaintiff on August 21, 2010.  Dkt. No. 1 at ¶ 23, 31.  It is alleged that

defendants Fischer, Rock, Kelsh, Gokey, Gravlin, Rock, Morris, Nuttall, and

Hawk are liable for violating plaintiff's due process rights by imposing upon

him the pre-hearing restricted diet.  *Id.* at ¶¶ 30, 38, 46.  Plaintiff's complaint

alleges that defendants Caron and Mattoon sabotaged plaintiff's disciplinary hearing by erasing staff misconduct on the video surveillance footage from the incident on October 12, 2010. *Id.* at 32. Finally, plaintiff alleges that defendant Bullis denied plaintiff the opportunity to present the surveillance video allegedly depicting defendant Gravlin's conduct on August 21, 2010, at the disciplinary hearing conducted in connection with the misbehavior report issued to plaintiff on that date. *Id.* at ¶¶ 39, 40.

### 1. <u>Legal Standard Governing Fourteenth Amendment Due Process Claims</u>

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). To determine whether a plaintiff's claims actually implicate a protected liberty interest, a court must first find that the restrictions placed on plaintiff constituted an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483 (1995); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996). Second, the court must conclude that the state has granted its inmate, by regulation or statute, a protected liberty

interest in remaining free from that confinement.  *Frazier*, 81 F.3d at 317; *see also Cespedes v. Coughlin*, 956 F. Supp. 454, 469 (S.D.N.Y.1997).

    2.   <u>Analysis</u>

        a.   <u>Defendant Cook</u>

Assuming, without deciding, that plaintiff had an actual liberty interest in having the video surveillance footage preserved from the incident with Defendant Gravlin on August 21, 2010, the record evidence does not give rise to a genuine dispute as to whether defendant Cook failed to preserve it for purposes of the disciplinary hearing conducted in connection with the misbehavior report issued against plaintiff on that date.  Specifically, defendant Cook's responses to plaintiff's interrogatories, which were submitted by plaintiff in response to the pending motion, explain that, pursuant to New York State regulations, her role as a disciplinary hearing assistant involves explaining the charges to the inmate, interviewing witnesses, obtaining any necessary documentary evidence, including written statements, and reporting her findings to the inmate.  Dkt. No. 154-8 at ¶¶ 7, 11.  Although she states that her obligations as a hearing assistant do not include "preserv[ing] video footage," she watched the videotape at issue here as part of her investigation into the incident, and to ensure that it was, in fact,

preserved for the hearing that was scheduled for September 23, 2010.[11] *Id.*

at ¶¶ 7, 8, 9, 11, 12, 15, 16, 20, 21, 22.  Finally, although plaintiff persisted in

his allegation that defendant Cook failed to preserve the videotape for the

hearing at his deposition, Dkt. No. 111-3 at 46, the transcript of his

disciplinary hearing on September 23, 2010 clearly demonstrates that the

videotape was in fact preserved and played at the hearing, Dkt. No. 1-2 at 18.

Accordingly, I find that no reasonable factfinder could conclude that, even

assuming plaintiff had a liberty interest in the preservation of the video

surveillance, defendant Cook deprived plaintiff of that interest through her

role as his hearing assistant.  For that reason, I recommend that plaintiff's

Fourteenth Amendment due process claim against defendant Cook be

dismissed.

> b.    Defendants Fischer, Rock, Kelsh, Gokey, Rock,
>        Morris, Nuttall, and Hawk

To the extent plaintiff's due process claim arises from allegations that

his rights were violated through the imposition of a seven-day pre-hearing

restricted diet, it fails in light of the well-established principle in this circuit that

imposing upon an inmate the restricted diet prior to a hearing for a limited

amount of time does not violate the inmate's due process rights.  *See*

---

[11]    I note that, in any event, by the time defendant Cook met with plaintiff on
August 23, 2010, the video surveillance tape at issue had already been requested for
preservation by plaintiff.  *Id.* at ¶¶ 11, 12.

*McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (affirming district court's dismissal of the plaintiff's due process claim arising from allegations that his rights were violated through the imposition of a seven-day pre-hearing restricted diet where the district court "found no atypical and significant hardship sufficient to implicate [the plaintiff]'s due process rights"); *see also Beckford v. Portuondo*, 151 F. Supp. 2d 204, 219 (N.D.N.Y. 2001) (Kahn, J.) (finding that the plaintiff's allegations that the defendants, *inter alia* restricted his diet and access to water for a week without a hearing did not violate his due process rights because the minimal amount of time the plaintiff had to endure such conditions was not sufficiently atypical or created a significant hardship).  In this case, the record is replete with indications that, during the seven days plaintiff was on the restricted diet, his health and well-being was monitored by medical personnel to ensure it did not deteriorate during that period.  Because there is no evidence to support a finding that the pre-hearing restricted diet created a significant hardship for plaintiff during those seven days, I find that no reasonable factfinder could conclude that plaintiff's due process rights were violated.  Accordingly, I recommend that this claim be dismissed against defendants Fischer, Rock, Kelsh, Gokey, Gravlin, Rock, Morris, Nuttall, and Hawk.[12]

---

[12]     Because I have concluded that plaintiff's due process claim in connection with the pre-hearing restricted diet fails in light of the lack of evidence that plaintiff suffered

c. <u>Defendants Caron and Mattoon</u>

A careful review of the record reveals that there is no evidence to support plaintiff's accusations against defendants Caron and Mattoon that they altered and/or modified the video surveillance tape from the incident on August 21, 2010. Dkt. No. 1 at ¶ 32. The only evidence in the record that tends to support this allegation is plaintiff's deposition testimony, which reveals that he has no basis for believing that defendants Caron and Mattoon altered the video at all. Plaintiff's full testimony in connection with this allegation is as follows:

> Q.  Okay. What about R. [Caron] and D. Mat[t]oon; you allege in your complaint in this case that they somehow distorted the videotape you have been talking about, did something with the camera angles and that sort of thing. What is your basis for that claim against those two defendants?
>
> A.  Because they had this system and it's manipulated by the computers, you know. They take these computers and they can manipulate the sounds or they can distance the cameras. All they – and by the computers and anybody that knows how to use technology that knows how to manipulate those computers, thehy can do anything. It's just like Hollywood with a camera, they can use cameras.

---

a significant or atypical hardship during the seven days he was placed on the diet, I have not considered defendants' arguments related to the lack of personal involvement of defendants Fischer, Rock, Kelsh, Gokey, Gravlin, Rock, Morris, Nuttall, and Hawk.

Q.   My question is, though: What is the basis for you saying that they did that to this video?

A.   Because the sound – you can tell, but the sound is crackling and other videotapes have normal sound, so it had to be somebody who knows what they are doing.

Q.   Okay. But how do you know – what is your proof that they did it?

A.   Because they are the ones that make the DVDs. I don't even know what I see, and they are the ones that make the DVDs.

Q.   Okay.

A.   So they have access to the computers, the programs, the downloads, however they do it. I'm not a technician, but I do know that any surveillance equipment can be altered by a person that knows how to manipulate it.

Q.   So your claim, basically, essentially as I'm understanding it, because they are technicians, you are basically saying that just because they are technicians, they may have access to this DVD, they are the ones that distorted it?

A.   I'm not basically saying that, sir. There is nothing basic about people discriminating and abusing somebody and deliberately manipulating, you know – obstruction of justice, you know.

Dkt. No. 111-3 at 52-53. This testimony suggests that plaintiff merely

suspects that defendants Caron and Mattoon tampered with the surveillance

footage.

On May 6, 2013 and July 29, 2013, the court received letter motions from plaintiff generally alleging that the surveillance videotapes submitted by defendants in support of their motion for summary judgment have been tampered with, and that the events depicted by those videotapes are not an accurate representation of what occurred. *See generally* Dkt. Nos. 133, 149. Plaintiff requests the court to strike any use of the videotapes and conduct "an *in camera* inspection of [the] video log pages of [the] original log[.]" *Id.* In response to these letter requests, defendants submitted a declaration from defendant Mattoon explaining the process used for transferring the surveillance footage onto a DVD. Dkt. No. 154-13 at 4-8. Specifically, defendant Mattoon explained that the scope of the footage captured on a particular videotape or DVD is formed by the description of the incident sought to be preserved "as outlined in the Unusual Incident Report, Use of Force Report, or Inmate Misbehavior Report[.]" *Id.* at 5. After detailing the steps taken to produce the surveillance videotapes submitted by defendants in support of their motion, defendant Mattoon averred that he has

> viewed both DVDs produced regarding the August 21,
> 2010 incident (DVD # L10-585) and the October 12,
> 2010 incident (DVD # L10-700), as well as the August
> 21, 2010 Inmate Misbehavior Report and the October
> 12, 2010 Use of Force Report, and I can state with

> certainty that there is no interruption in the date and
> time counter on either DVD . . . . Additionally, both
> DVDs capture the entire incidents as described in the
> August 21, 2010 Inmate Misbehavior Report and the
> October 12, 2010 Use of Force Report.

*Id.* at 8.  In light of this evidence, and the fact that plaintiff's allegation that

defendants Mattoon and Caron tampered with the videotapes is based on

nothing more than his mere suspicion, I find that no reasonable factfinder

could conclude that those defendants modified the surveillance footage.

Accordingly, I recommend that plaintiff's Fourteenth Amendment due process

claim against defendants Mattoon and Caron be dismissed.  Additionally,

plaintiff's requests to strike the videotapes and conduct an *in camera* review

of any log books, Dkt. Nos. 133, 149, are denied.

### d.    Defendant Bullis

Plaintiff has alleged that defendant Bullis, who conducted the

disciplinary proceedings in connection with the misbehavior report issued

against plaintiff arising from the incident on August 21, 2010, violated his due

process rights during that hearing when he refused to permit plaintiff to show

the video surveillance tape or call witnesses at the disciplinary proceeding.

Dkt. No. 1 at 39, 40, 42, 43, 44.  The procedural safeguards to which a prison

inmate is entitled before being deprived of a constitutionally cognizable liberty

interest are well established, the contours of the requisite protections having

been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67 (1974). Under *Wolff*, the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-70; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985).

In this case, because plaintiff attached the transcript of the disciplinary hearing to his complaint, the court has had the opportunity to review the procedures provided to plaintiff at the hearing. Dkt. No. 1-2 at 15-60. A careful review of that transcript reveals that all of the procedural safeguards called for by the Supreme Court were afforded to plaintiff. Plaintiff was provided advanced written notice of the charges. *Id.* at 17. He was also offered, and took advantage of, an opportunity to call witnesses on his behalf and present evidence. *Id.* at 23, 27, 31. In fact, all three witnesses (Bell,

42

Thomas, and Gokey) that plaintiff requested to testify did so. *Id.* Although defendant Bullis denied plaintiff the opportunity to ask the witnesses questions unrelated to the charges contained in the misbehavior report, defendant Bullis provided plaintiff numerous opportunities to ask relevant questions and reminded plaintiff of the specific issues at hand. *Id.* at 25, 28, 33. Similarly, although plaintiff requested that defendant Bullis watch the part of video surveillance tape allegedly showing that defendant Gravlin tampered with his food, defendant Bullis denied plaintiff's request because the narrow issues for the proceeding focused only on whether plaintiff disobeyed defendant Gravlin's direct order to hand out his tray of food for pick up. *Id.* at 20, 25. Defendant Bullis explained to plaintiff several times that any allegations of misconduct by defendant Gravlin should be directed by plaintiff through the inmate grievance program, and not at the disciplinary hearing. *Id.* at 21, 25, 35, 36, 37. In addition, plaintiff was provided with a copy of defendant Bullis' decision at the close of the disciplinary proceeding. *Id.* at 60. Plaintiff was also afforded the assistance of a corrections counselor, defendant Cook, in preparing for the disciplinary hearing. *Id.* at 17. Finally, a review of the hearing transcript demonstrates that defendant Bullis' decision finding plaintiff guilty was supported by at least some evidence. Defendant Bullis watched the video surveillance tape that showed plaintiff refusing to

hand out his feed up tray on August 21, 2010, and defendant Gravlin testified at the hearing to the same effect. *Id.* at 34, 60. Accordingly, I find that no reasonable factfinder could conclude that defendant Bullis violated plaintiff's due process rights in connection with the disciplinary hearing held on September 23, 2010. For that reason, I recommend plaintiff's due process claim against defendant Bullis be dismissed.

### F. Plaintiff's First Amendment Retaliation Claim

Plaintiff's complaint asserts a First Amendment retaliation claim against defendant Gravlin arising out of two separate instances. First, plaintiff alleges that defendant Gravlin tampered with his food on August 21, 2010, out of retaliation for plaintiff filing grievances at Upstate. Dkt. No. 1 at ¶¶ 27, 37. Second, and similarly, it is alleged that defendant Gravlin used excessive force against him on October 12, 2010, in retaliation for plaintiff's filing of grievances against him. *Id.* at ¶ 48.

### 1. Legal Standard Governing First Amendment Retaliation Claims

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir.

2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.").  To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

      2.   <u>Analysis</u>

Plaintiff's allegations that defendant Gravlin tampered with his food on August 21, 2010, and used force against him on October 12, 2010 out of retaliation for plaintiff's filing of grievances, are sufficient to satisfy the first requirement of a retaliation analysis.  It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).

Even assuming, without deciding, that defendant Gravlin's conduct, as alleged, satisfies the second, adverse action, requirement, there is insufficient record evidence to give rise to a dispute of fact as it relates to the third, causation, element. There is no record evidence that plaintiff filed a grievance against defendant Gravlin prior to August 21, 2010, or that, assuming plaintiff did file any, defendant Gravlin knew about them. For that reason, plaintiff's allegation that defendant Gravlin tampered with his food out of retaliation for plaintiff's filing of grievances must be dismissed. Similarly, although the record demonstrates that plaintiff filed grievances related to the food-tampering incident on August 21, 2010, aside from plaintiff's conclusory allegation, there is nothing in the record that suggests defendant Gravlin used the force he applied on plaintiff on October 12, 2010 because of those grievances. Dkt. No. 1 at ¶ 48. Instead, there is evidence that suggests defendant Gravlin applied force against plaintiff on that date because he became loud and uncooperative during an escort, and then turned aggressively toward him. Gravlin Decl. (Dkt. No. 111-4) at ¶ 16; Gravlin Decl. Exh. D (Dkt. No. 111-4) (traditionally filed, not electronically filed). Because there is no evidence to support plaintiff's allegation that defendant Gravlin's conduct on October 12, 2010 was in response to the grievances filed against him by plaintiff, I recommend that this claim be dismissed, as well.

G.    Plaintiff's First Amendment Free Exercise Claim

Plaintiff's complaint asserts a First Amendment free exercise claim against defendants Hawk, Nuttal, and Leonard arising from allegations that defendant Hawk informed plaintiff that the imposition of the pre-hearing restricted diet superseded his Ramadan meals, and that he did so following consultation with and advisement from defendants Nuttall and Leonard.  Dkt. No. 1 at ¶¶ 33, 34.

1.    Legal Standard Governing First Amendment Free Exercise Claims

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services.  *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.").  That right, however, is not

without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). When determining whether a refusal by prison officials to permit an inmate's attendance at a religious service impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin*, 905 F.2d at 574 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988).

As a threshold matter, "[t]he prisoner must show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75. In evaluating this factor, the court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only

whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

The court then inquires into whether a defendant's conduct, which allegedly deprives the plaintiff of his free exercise rights, is reasonably related to some penological interest. *Ford*, 352 F.3d at 594; *see also Washington v. Gonyea*, -- F. App'x ----, No. 11-0980, 2013 WL 4792413, at *3 (2d Cir. Sept. 10, 2013) ("Even if Defendants-Appellees substantially burdened [the Plaintiff-Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)). To evaluate whether a challenged regulation or decision by prison officials is reasonable,[13] courts must evaluate the following four factors:

---

[13] Indeed, the Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a

> [(1)] [W]hether the challenged regulation or official
> action has a valid, rational connection to a legitimate
> governmental objective; [(2)] whether prisoners have
> alternative means of exercising a burdened right; [(3)]
> the impact on the guards, inmates, and prison
> resources of accommodating the right; and [(4)] the
> existence of alternative means of facilitating exercise
> of the right that have only a de minimis adverse effect
> on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (footnote omitted).

2. <u>Analysis</u>

Before turning to the merits of plaintiff's First Amendment claim, the court pauses to address whether there is sufficient record evidence from which a reasonable factfinder could conclude that defendants Nuttall, Leonard, and Hawk were personally involved in the constitutional violation. "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright*, 21 F.3d at 501 (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a

---

prison regulation denying such exercise." *Salahuddin*, 467 F.3d at 274 n.4.

section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). In this case, plaintiff asserts a First Amendment claim against defendants Nuttall and Leonard based on allegations that they advised defendant Hawk that plaintiff has no First Amendment right to a Ramadan meal. Dkt. No. 1 at ¶ 34. There is no record evidence to support this claim, however, aside from plaintiff's allegations. Instead, defendants have set forth evidence showing that neither defendant Nuttall nor defendant Leonard was employed by the DOCCS in August 2010, the time they supposedly advised defendant Hawk regarding plaintiff's rights. *See* Dkt. No. 111-9 at ¶ 4 (defendant Nuttall averring that he retired in September 2007); Dkt. No. 111-11 at ¶ 2 (defendant Leonard averring that he retired in January 2010). Because defendants Nuttall or Leonard were not employed by the DOCCS at the time of the allegations giving rise to the claims against them, I find that no reasonable factfinder could conclude that they were personally involved in the asserted constitutional violation. Accordingly, I recommend that plaintiff's

First Amendment claim against defendants Nuttall and Leonard be dismissed.

Turning to plaintiff's allegations against defendant Hawk, it is specifically alleged that he violated plaintiff's First Amendment rights when he informed plaintiff that the imposition of the pre-hearing restricted diet superseded his Ramadan diet. Dkt. No. 1 at ¶¶ 33, 34. Liberally construing his complaint, plaintiff appears to allege that the imposition of the restricted diet violated his rights because it interfered with his right to participate in specific meals during Ramadan. There is no record evidence, however, suggesting that defendant Hawk was responsible for imposing the restricted diet on plaintiff. Instead, the record demonstrates that defendant Gokey recommended plaintiff be placed on the pre-hearing restricted diet to defendant Kelsh, who, in turn, made the recommendation to defendant Rock. Dkt. No. 129-1 at ¶¶ 12, 13; Dkt. No. 129-1 (Exh. B) at 8. Defendant Rock approved the recommendation on August 21, 2010. *Id.* Because there is no record evidence that defendant Hawk was personally involved in deciding whether to impose the restricted diet upon plaintiff in this case, I recommend that the First Amendment claim be dismissed against him.

To the extent plaintiff's complaint could be construed as asserting a First Amendment free exercise claim against defendants Gokey, Kelsh, Rock,

and Bullis for imposing the restricted diet upon plaintiff, thus precluding him from participating in the prepared Ramadan meals, that claim is subject to dismissal at this juncture. Even assuming, without deciding, that plaintiff has satisfied his burden of demonstrating that the restricted diet imposed a substantial burden on his religious rights, defendants have set forth significant evidence, which plaintiff has left unopposed, demonstrating that their decision was reasonably related to a legitimate penological interest. Specifically, defendant Uhler explains in his declaration that the restricted diet is utilized as a penalty for rules violations that are imposed upon inmates pursuant to New York State regulations. Dkt. No. 111-6 at ¶ 9 (citing 7 N.Y.C.R.R. § 304.2). One of the rules violations that can give rise to a restricted diet penalty is a failure to obey a direct order at the time of a meal distribution or refusal to obey a direct order to return a food container or utensil at the conclusion of a meal. *Id.* (citing 7 N.Y.C.R.R. § 304.2(b)(3)). New York State regulations also permit the superintendent of a prison facility to place an inmate on a restricted diet for no more than seven days pending the outcome of a disciplinary hearing. *Id.* at ¶ 10 (citing 7 N.Y.C.R.R. § 304.2(b)). According to defendant Uhler, the penalty is "a valuable tool for controlling or attempting to control inmate behavior for those inmates who continually misbehave while assigned to the SHU or who participate in the

types of behavior identified in 7 N.Y.C.R.R. § 304.2." *Id.* at ¶ 13. Moreover,

> [t]he use of restricted diets as disciplinary sanctions is considered appropriate for inmates who, like plaintiff, are assigned to long-term Special Housing and who continue to misbehave and be disruptive. . . . Barnes' disciplinary history . . . exhibit[s] a pattern of ongoing and consistent misconduct prior to August 2010 which justified the imposition of the restricted diet as a disciplinary sanction, and he continues to do so.

*Id.* at ¶ 14. In this case, plaintiff was charged with disobeying defendant Gravlin's direct order to return his food container. Dkt. No. 111-4 at ¶ 9. According to defendant Uhler, in light of plaintiff's lengthy disciplinary history, which includes at least sixteen misbehavior incidents between September 5, 2009 and August 21, 2010, the circumstances were appropriate to impose the restricted diet upon plaintiff both before and after the disciplinary proceedings were conducted. Dkt. No. 111-6 (Exh. A) at 7-9. Moreover, defendants have submitted a declaration from Imam Muhammad Ahmed, a DOCCS employee serving in the DOCCS Office of Ministerial Family and Volunteer Services, in which he states that the restricted diet, consisting of a loaf and raw shredded cabbage, "is, in fact halal [permissible] and is not in violation of the dietary restrictions of the Islam faith during Ramadan being that the ingredients which constitutes the restricted Loaf are permissible to be eaten in Islam." In light of all of this evidence, I find that no reasonable

factfinder could conclude that imposition of the restricted diet both before and after the disciplinary hearing in connection with the incident on August 21, 2010 was not reasonably related to a penological interest. Accordingly, I recommend that plaintiff's First Amendment claim, to the extent asserted against defendants Gokey, Kelsh, Rock, and Bullis with respect to the imposition of the restricted diet, be dismissed.

### H. Plaintiff's RLUIPA Claim

Plaintiff's complaint asserts a RLUIPA claim against defendants Hawk, Nuttal, and Leonard arising from allegations identical to those that give rise to plaintiff's First Amendment free exercise claim. Specifically, it is alleged that defendant Hawk informed plaintiff that the imposition of the pre-hearing restricted diet superseded his Ramadan meals, and that he did so following consultation with and advisement from defendants Nuttall and Leonard. Dkt. No. 1 at ¶¶ 33, 34.

### 1. Legal Standard Governing RLUIPA Claims

The the RLUIPA provision applicable to this case provides, in pertinent part, that

> [n]o government shall impose a substantial burden on
> the religious exercise of a person residing in or
> confined to an institution, . . . even if the burden
> results from a rule of general applicability, unless the
> government demonstrates that imposition of the

burden on that person–

(1)    is in furtherance of a compelling governmental interest; and

(2)    is the least restrictive means of furthering that compelling interest.

42 U.S.C. 2000cc-1(a). "As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009).

Similar to claims arising under the First Amendment free exercise clause, in considering claims arising under the RLUIPA courts apply a burden-shifting analysis. *Harnett v. Barr*, 538 F. Supp. 2d 511, 520 (N.D.N.Y. 2008) (Hurd, J.). Under the established protocol, the plaintiff bears the initial obligation of showing that his religious exercise has been burdened and that the burden is substantial. *Harnett*, 538 F. Supp. 2d at 520 (citing *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)). The focus then shifts to the government to show that the burden furthers a compelling governmental interest and that it represents the least restrictive means of achieving that interest. *Hartnett*, 538 F. Supp. 2d at 520. Under the RLUIPA, "religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

2.   <u>Analysis</u>

For the same reasons that the First Amendment claim asserted against

defendants Hawk, Nuttall, and Leonard is subject to dismissal at this

juncture, plaintiff's RLUIPA claim is ripe for dismissal against them.  More

specifically, because there is no record evidence from which a reasonable

factfinder could conclude that defendants Hawk, Nuttall, and Leonoard were

personally involved in the allegations giving rise to plaintiff's RLUIPA claim, I

recommend that the claim be dismissed as against those defendants.[14]

To the extent that plaintiff's complaint may be construed as asserting a

RLUIPA claim against defendants Gokey, Kelsh, Rock, and Bullis, I find that

there is sufficient record evidence to recommend dismissal of that claim at

this time.  As explained above in connection with plaintiff's First Amendment

claim asserted against those defendants, defendants have submitted

evidence of plaintiff's lengthy disciplinary history that compelled defendants

---

[14]    Although the Second Circuit has not yet explicitly addressed whether personal involvement is a prerequisite to recovery under the RLUIPA, it has suggested in dicta that a plaintiff must demonstrate a defendant's personal involvement before prevailing on a RLUIPA claim.  *See Salahuddin*, 467 F.3d at 279 (vacating the district court's judgment against the plaintiff with respect to his First Amendment and RLUIPA claims, and leaving the personal involvement determination to the district court on remand).  Since *Salahuddin*, several district courts have followed the Second Circuit's suggestion, finding a defendant's personal involvement a necessary element of a RLUIPA claim.  *See, e.g.*, *Joseph v. Fischer*, No. 08-CV-2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (citing cases).  In light of the Second Circuit's implicit finding that personal involvement is necessary, and because I agree with the rationale offered by the courts that have examined the issue, I have proceeded in this case under the presumption that plaintiff must establish personal involvement to prevail on his RLUIPA claim.

to impose the restriction upon plaintiff. To reiterate, between September 9, 2009 and August 21, 2010 (the date of the incident giving rise to the restricted diet sanction), plaintiff was subject to sixteen disciplinary proceedings conducted in connection with the incident on August 21, 2010. Moreover, at plaintiff's disciplinary proceeding, defendant Gokey testified that she had a difficult time recalling plaintiff's conduct precisely on August 21, 2010, because "there [had] been several instances involving [the plaintiff] and Ramadan feed up trays." Dkt. No. 1-2 at 31. All of this evidence is sufficient to establish that defendants' imposition of the restricted diet furthered a compelling governmental interest in maintaining order and security at Upstate, and that it was the least restrictive means necessary, where plaintiff had been subject to multiple disciplinary proceedings and sentences in the year previous to the incident on August 21, 2010. For these reasons, I find that no reasonable factfinder could conclude that defendants' imposition of the restricted diet sanction did not further a compelling governmental interest. *See Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (finding that the RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety," and holding that a court must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to

maintain good order, security and discipline"). Accordingly, I recommend that plaintiff's RLUIPA claim, to the extent asserted against defendants Gokey, Kelsh, Rock, and Bullis with respect to the imposition of the restricted diet, be dismissed.

## I. Plaintiff's Supervisor Liability Claim

Plaintiff's complaint asserts supervisor liability claims against defendants Fischer, Prack, and Uhler.[15]  It is alleged that defendant Fischer inadequately trained and supervised his subordinates.  Dkt. No. 1 at ¶¶ 26, 45.  Plaintiff's complaint further alleges that defendant Uhler "failed to remedy [the] wrong and actively participated in racial discrimination."  *Id.* at 44.

### 1. Legal Standard Governing Supervisor Liability Claims

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright,* 21 F.3d at 501.  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  *Bass*, 790 F.2d at 263.  It is well established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor because there is no

---

[15]     Because defendants have not included defendant Prack in their motion, this report does not consider whether the evidence in the record supports that claim.

*respondeat superior* liability under section 1983.[16]  *Richardson v. Goord*, 347

F.3d 431, 435 (2d Cir. 2003).  A supervisor, however, may be held

responsible for a civil rights violation when it is established that he (1) has

directly participated in the challenged conduct; (2) after learning of the

violation through a report or appeal, failed to remedy the wrong; (3) created

or allowed to continue a policy or custom under which unconstitutional

practices occurred; (4) was grossly negligent in managing subordinates who

caused the unlawful event; or (5) failed to act on information indicating that

unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53

(2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 556 U.S.

662 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58

F.3d 865, 873 (2d Cir. 1995).

  2. <u>Analysis</u>

   a. <u>Defendant Fischer</u>

 Plaintiff's complaint alleges that defendant Fischer, as the

commissioner of the DOCCS, is liable in this case for failing to train and

supervise his subordinates.  Dkt. No. 1 at ¶¶ 26, 45.  Plaintiff elaborated on

this allegation at his deposition by testifying that, because the DOCCS

receives federal funding for religious programming for inmates, it should have

---

[16] Defendants Fischer and Uhler are supervisory DOCCS employees.

a training program for employees in place. Dkt. No. 111-3 at 85. Standing alone, these conclusory statements are insufficient to establish the required personal involvement for a section 1983 claim against a supervisory official, and there is no evidence in the record that supports plaintiff's allegations.

b.  Defendant Uhler

Although the complaint contains other allegations against defendant Uhler, to the extent that the allegation that defendant Uhler "failed to remedy wrong [sic] and actively participated in racial discrimination," Dkt. No. 1 at ¶ 44, attempts to assert supervisor liability against him, it is insufficient to give rise to a constitutional violation. Even liberally construed, in the context of plaintiff's complaint, it is unclear to the court as to which "wrong" plaintiff refers.

At his deposition, it appears that plaintiff accused defendant Uhler of not answering his grievance arising from the incident on August 21, 2010. Dkt. No. 111-3 at 96-97. In contrast to this testimony, however, is defendant Uhler's declaration that he referred the grievance to which plaintiff refers to defendant Gokey for investigation. Uhler Decl. (Dkt. No. 111-6) at ¶¶ 15, 16. Without more, plaintiff's conclusory allegation that defendant Uhler "failed to remedy" a wrong is not sufficient to establish defendant Uhler's personal involvement. *See Sealey v. Glitner*, 116 F.3d 47, 51 (2d Cir. 1997) (finding

insufficient personal involvement where the defendant, a supervisor, referred one of plaintiff's letters to a subordinate and responded promptly to a second inquiring into the status of his appeal).  Accordingly, I recommend that this claim be dismissed.

### J.    Qualified Immunity

As an alternative argument in support of their motion for summary judgment, defendants contend that they are entitled to qualified immunity from suit.  Dkt. No. 111-2 at 39-43.  In the event this report is adopted, the only remaining claim will be plaintiff's Eighth Amendment excessive force cause of action asserted against defendants Allen, Gravlin, Garrison, and Richardson.  Accordingly, I have analyzed only whether those defendants are entitled to qualified immunity at this juncture with respect to that claim.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012).  The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.  Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct.  *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors.  *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).  To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law."  *Green v. Montgomery*, 219 F.3d 52, at 59 (2d Cir. 2000).  The inquiry, then, turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time.  *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011); *Doninger*, 642 F.3d at 345 (citing cases).  To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 131 S.Ct. at 2083 (internal quotation marks omitted).  Until recently, courts were required to analyze qualified immunity by

considering the two factors in order.  *Doninger*, 642 F.3d at 345 (citing *Saucier*, 533 U.S. at 201).  Following the Supreme Court's decision in *Pearson*, however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered.[17]  *Id.*; *see also Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 n.9 (2d Cir. 2009).

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry in this case turns on whether officers in the positions of defendants Allen, Gravlin, Richardson, and Garrison would have reasonably believed that their conduct amounted to excessive force and violated plaintiff's Eighth Amendment rights.  *See Green*, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established.").  In light of the genuine dispute of fact surrounding whether defendants used the force applied in order to restore order after plaintiff attempted to pull his mechanical restraints into his cell after the retention strap was removed, or instead maliciously and sadistically used force against plaintiff for the sole purpose of causing harm, I

---

[17]    Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231 (internal quotation marks omitted).

cannot conclude, at this juncture, that defendants are entitled to qualified immunity. In the event a reasonable factfinder credits plaintiff's version of the events on October 12, 2010 – and specifically the portion of his version where he alleges defendants Gravlin, Richardson, and Garrison pulled the retention strap, while it was still connected to plaintiff, away from him for no reason – it would be unlikely that the court could conclude that it was reasonable for officials in the position of defendants Allen, Gravlin, Richardson, and Garrison to believe that such conduct did not violate plaintiff's constitutional rights. Accordingly, I recommend that defendants' motion for summary judgment based on qualified immunity be denied.

K.    Status of Defendant Prack

On May 18, 2012, the court issued an order denying plaintiff's motion for leave to file an amended complaint but directing that the clerk of the court "revise the docket to add 'Albert Prack, Director of Special Housing,' as a defendant in this action." Dkt. No. 80 at 15. Although a summons was issued as to defendant Prack on that same date, Dkt. No. 81, it was returned to the court unexecuted, Dkt. No. 91. Plaintiff will now be ordered to show cause, within fourteen days of this report, why the court should not automatically dismiss defendant Prack from this action in light of plaintiff's failure to comply with rule 4.1 of the local rules of practice for this court,

which requires "service of process upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y. L.R. 4.1(b).

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this case asserts eight causes of action against nineteen defendants. In support of their pending motion for summary judgment, defendants have argued that the record fails to give rise to a dispute of fact with respect to all of plaintiff's claims. After carefully reviewing the record evidence in the light most favorable to plaintiff, I agree with defendants, except in connection with plaintiff's excessive force claim. As it relates to the excessive force claim, I find that there exists a dispute of fact as to whether the force used by defendants Gravlin, Garrison, and Richardson was applied in a good faith effort to restore discipline after plaintiff attempted to pull his restraints into his cell, or instead applied in a malicious and sadistic manner. Moreover, because the video surveillance clearly shows that defendant Allen was present for the use of force, and in light of the genuine dispute of fact regarding the application of force, a reasonable factfinder could conclude that defendant Allen neglected his obligation to intervene.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 111) be GRANTED, in part, and that all of plaintiff's claims be dismissed in this case, with the exception of plaintiff's excessive force claim asserted against defendants Gravlin, Garrison, Richardson, and Allen.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is also hereby

ORDERED that plaintiff's motions to strike the use of the surveillance footage and conduct an *in camera* review of a surveillance logbook (Dkt. Nos. 133, 149) are DENIED; and it is further

ORDERED that plaintiff show cause, in writing and within fourteen days of this report, why the court should not automatically dismiss defendant Prack from this action; and it is further

ORDERED that the clerk of the court serve a copy of this report and

recommendation upon the parties in accordance with this court's local rules.

Dated:     September 30, 2013
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 etseq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See*Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* [N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a)](#) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122911 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

**4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths**

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

**5. Dismissal of Action**

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

**B. Due Process**

**1. Samuels Pleads a Valid Due Process Claim**

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,*
520 U.S. 641, 647 (1997)). At the same time, "[p]rison
walls do not form a barrier separating prison inmates from
the protections of the Constitution." *Duamutef v. Hollins,*
297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With
respect to Tier III hearings such as the one at issue here,
the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written
notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present
evidence "when permitting him to do so would not be
unduly hazardous to institutional safety or correctional
goals";

(3) the inmate be judged by a fair and impartial hearing
officer;

(4) the disciplinary conviction be supported by some
evidence; and

(5) the inmate be provided with a written statement of fact
findings that support the disposition as well as the reasons
for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v.*
*McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal
citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the
aforementioned rights under *Wolff. See* Reply Brief, at 13.
They argue, however, that Samuels received all the
procedural safeguards due him. Before analyzing
defendants points in detail, the Court notes the paucity of
the record before it. While Samuels has provided nearly
fifty exhibits, defendants have provided only a two-page
affidavit by Inmate Grievance Program Director Thomas
G. Eagen dated March 13, 2002, attached to which is a
nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit,
*inter alia,* a transcript of the disciplinary hearing, a
transcript or audio recording of the confidential witness
statements, a written basis for the rejection of Samuels'
witnesses, or a copy of the documents that were
supposedly seized from Samuels' cell. While the Court is
cognizant of the fact that the instant motion is not one for
summary judgment, without these and other documents, it
is difficult for this Court fully to evaluate the merits of the
parties' arguments. More troubling is the fact that this is
apparently not the first time an inmate has been sentenced
to a special housing unit on the basis of evidence which
has not been preserved for judicial review. Indeed, in
*Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS
9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by
defendants, the court noted that on more than one
occasion, Selsky was forced to reverse his previous
decision denying an inmate's appeal because the "record
of [the disciplinary] hearing was incomplete and the
'confidential tape' was 'unavailable for judicial review.'
' *Id.* at *9 (citation omitted). On the occasion cited by the
*Cherry* court, the inmate's record was expunged, but only
after the plaintiff had served 125 days in a special housing
unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were
violated because he was not permitted to call Dr.
Peter-Raoul as a witness at his disciplinary hearing. *See*
Complaint, at 9; Ex. V, at 2. Defendants state, without
explanation, that "it is clear that the proffered testimony
would have been irrelevant and redundant." Motion Brief,
at 13. The Court agrees with defendants that the right of an
inmate to call witnesses in his defense is not limitless.
Nevertheless, prison authorities' failure to allow an inmate
to call a witness may be grounds for reversal, where the
authorities fail to justify their actions. *See Ayers v. Ryan,*
152 F.3d 77, 81 (2d Cir.1998). In this case, Dr.
Peter-Raoul was apparently the author of some or all of
the "subversive" materials and had close ties to the
theological seminary program at the prison. According to
Samuels, she also "assisted plaintiff with his course
syllabus and provided much of the material utilized"
therein. Complaint, at 9. She was therefore in a unique
position to explain the appropriateness and relevance of
the materials allegedly possessed by Samuels, who had in
fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998).* Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward, 458 F.Supp. 624, 627 (S.D.N.Y.1978).*

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

***14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a).* In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000)* (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997).* While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." Colon, 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Issac McDONALD, Plaintiff,
v.
Israel RIVERA, et al, Defendants.
No. 9:06-CV-410 (LEK/DEP).

Jan. 30, 2008.
Issac McDonald, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Jaime Irene Roth, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on December 27, 2007 by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 27). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Issac McDonald, which were filed on January 9, 2008 and January 24, 2008. Objections (Dkt.Nos.34, 38).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 27) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 25) is **DENIED** as to Plaintiff's equal protection and retaliation claims, as against Defendants Costonas, Wildermuth, and Frazier, but otherwise **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Issac McDonald, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. After two false starts plaintiff has now filed an amended complaint meeting the court's pleading requirements, alleging that he was harassed by corrections workers at the facility in which he was housed at the relevant times, ostensibly in retaliation for his having registered complaints regarding his treatment. As relief, plaintiff's seeks both a declaration that defendants violated his constitutional rights and recovery of compensatory and punitive damages of at least $300,000.

In response to plaintiff's complaint, defendants have moved seeking its dismissal on a variety of bases, arguing that 1) it fails to assert any basis for finding personal liability against some of the defendants; 2) plaintiff's claim of equal protection, as pleaded, lacks merit; 3) plaintiff's retaliation cause of action is improperly stated in only conclusory terms, and does not meet any of the three requirements for establishing such a claim; 4) plaintiff's claim of cruel and unusual punishment is lacking in merit; and 5) plaintiff has failed to state a cognizable claim under the Civil Rights of Institutionalized Persons Act, which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

does not confer a private right of action upon prison inmates.[FN1] For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied.

> FN1. In their motion, defendants also seek dismissal of any claim by the plaintiff for injunctive relief, based upon his transfer out of the facility at which the relevant events occurred. *See* Defendants' Memorandum (Dkt. No. 25-2) at 9. Because careful review of plaintiff's amended complaint does not disclose any request by him for such equitable relief, I have not addressed this portion of the defendants' motion.

## I. *BACKGROUND*[FN2]

> FN2. In light of the procedural posture of this case, the following recitation is drawn from plaintiff's complaint, the allegations of which have been accepted as true solely for purposes of defendants' motion. *See Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

**\*2** At the times relevant to his claims, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services (the "DOCS"), and designated to the Coxsackie Correctional Facility ("Coxsackie"), located in Coxsackie, New York. *See generally* Amended Complaint (Dkt. No. 16).

On August 16, 2005, as he was being transferred to the B-2 company at Coxsackie, plaintiff was approached by defendant M. Wildermuth, a corrections officer, and told that if he made any noise he would be issued a misbehavior report, and that the corrections officer, who did not like McDonald, would do whatever was necessary to cause him to be detained in keeplock confinement or transferred into the facility's special housing unit ("SHU"). *Id* . ¶ 1. According to the plaintiff, defendant Wildermuth made good on that promise on August 24, 2005, by issuing him a misbehavior report charging two disciplinary

infractions, including refusal to obey an order (Rule 106.10) and failure to follow staff guidelines (Rule 121.12) *Id.* ¶ 2. On that same date-although it is unclear whether this was as a direct result of the issuance of a misbehavior report-defendant Wildermuth also denied plaintiff access to both a designated recreation period and his evening meal. *Id.* ¶ 3. According to the plaintiff, these actions were taken in retaliation for his having spoken to a corrections sergeant on the prior day, apparently concerning defendant Wildermuth's threats. *Id.*

Plaintiff filed a formal grievance on August 24, 2005 regarding derogatory remarks made by defendant Wildermuth. Amended Complaint (Dkt. No. 16) ¶ 4. On the following day, Corrections Officer Wildermuth responded by threatening to plant a weapon in plaintiff's cell for the purpose of orchestrating a lengthy period of disciplinary confinement for McDonald. *Id.* ¶ 5. That threat led to the plaintiff's filing of a second grievance to address defendant Wildermuth's conduct. *Id.*

On August 30, 2005, plaintiff was issued another misbehavior report, on this occasion by Corrections Officer J. Frazier, also a named defendant in the action, accusing him of intentional sexual exposure (Rule 101.20) and failure to obey a direct order (Rule 106.10). As a result of that second misbehavior report, also attributed by the plaintiff to retaliatory animus based upon his having filed grievances against defendant Wildermuth, and alleged by him to contain baseless accusations, plaintiff was placed in keeplock confinement for thirty days. Amended Complaint (Dkt. No. 16) ¶ 6.

Plaintiff claims that following these events he was subjected to continuing harassment while at Coxsackie, and specifically alleges that on October 22, 2005 he was harassed and threatened by Corrections Officer J. Frazier. Amended Complaint (Dkt. No. 16) ¶ 10. Over time, plaintiff lodged complaints with various prison officials regarding the conduct of corrections officers at Coxsackie, including with facility Superintendent Israel Rivera, an un-named Deputy Superintendent of Security at the prison, and Corrections Captain Gary Costonas. *Id.* ¶¶ 7-13. Plaintiff maintains that despite those complaints, most of which went unanswered, the harassment continued and that after his release from keeplock confinement he was

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

returned to the B-2 housing unit at Coxsackie, despite his request for a transfer into another housing unit within the facility. *Id.*

II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on March 1, 2006. Dkt. No. 1. After having been alerted by the court to various procedural and substantive deficiencies, *see* Dkt. Nos. 4, 8, 14, plaintiff submitted an amended complaint received by the court on or about December 20, 2006, and the filing of which was thereafter approved by order issued by Senior District Judge Lawrence E. Kahn on January 23, 2007. Dkt. Nos. 16, 17. As defendants, plaintiff's complaint names Israel Rivera, the Superintendent at Coxsackie; Corrections Captain Gary Costonas; and Corrections Officers M. Wildermuth and J. Frazier.<sup>FN3</sup> Dkt. No. 16. Plaintiff's complaint, as amended, asserts four distinct causes of action, alleging 1) unlawful retaliation, based upon his filing of grievances; 2) denial of equal protection; 3) cruel and unusual punishment; and 4) violation of the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997-1997j, and seeks both declaratory relief and an award of damages.

> FN3. While plaintiff's complaint also named H.D. Graham, identified as the Superintendent of the Auburn Correctional Facility, as a defendant he has since been dismissed from the action, based upon the plaintiff's failure to reference him in the body of that pleading. *See* Dkt. No. 17 at 2.

On April 9, 2007, in response to the filing and service of plaintiff's amended complaint, defendants moved seeking dismissal of plaintiff's claims on a variety of bases. Dkt. No. 25. That motion, which plaintiff has not opposed despite passage of the response deadline, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).<sup>FN4</sup> *See also* Fed.R.Civ.P. 72(b).

> FN4. Plaintiff's failure to respond in opposition to defendants' motion does not serve as an impediment to a determination of that motion. *See, e.g., White v. Mitchell,* No. 99-CV-8519,

2001 WL 64756, at \*1 (E.D.N.Y. Jan. 18, 2001). Motions to dismiss test only the legal sufficiency of the complaint; accordingly, while a party should be afforded a reasonable opportunity to respond to such a motion a court can judge the sufficiency of a complaint as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir.2000). It should be noted, moreover, under this court's local rules the plaintiff's failure to respond to defendants' properly filed motion could be regarded as his consent to granting of that motion, provided that the defendants have met their burden of making a facial showing of entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also McCall, 232 F.3d at 322-23* (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall* ).

III. *DISCUSSION*

A. *Rule 12(b)(6) Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

**\*4** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 2007 WL 4179838, at \*3 (2d Cir. Nov. 28, 2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly* ).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal

pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B. *Personal Involvement*

Plaintiff's complaint names Superintendent Rivera and Corrections Captain Costonas as two of the defendants being sued. It does not, however, allege direct involvement on the part of either of those defendants in the constitutional deprivations alleged. Instead, plaintiff's claims against those two individuals arise from his complaints to them regarding the ongoing harassment which he experienced while at Coxsackie and the fact that for the most part his requests for their intervention went unanswered. *See, e.g.,* Amended Complaint (Dkt. No. 16) ¶¶ 7, 9, 10, 11, 12 and 13.

**\*5** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Both of the defendants now seeking dismissal on this basis appear to have held supervisory positions at Coxsackie during the relevant times. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

### 1. *Superintendent Rivera*

Plaintiff's sole complaint against Superintendent Rivera is that despite writing to him in his capacity as facility superintendent to complain of the treatment received from corrections workers at Coxsackie, those letters went unanswered. This allegation, standing alone, is insufficient to establish the requisite degree of personal involvement on the part of defendant Rivera in the constitutional violations alleged. *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y.Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). Accordingly, I recommend dismissal of plaintiff's claims as against defendant Superintendent Rivera.

### 2. *Corrections Captain Costonas*

**\*6** Like Superintendent Rivera, Corrections Captain Gary Costonas also is alleged to have received multiple written complaints from the plaintiff concerning his circumstances. Amended Complaint (Dkt. No. 16) ¶¶ 9, 11-13. While, as was the case with respect to Superintendent Rivera, most of those letters went unanswered, a written communication by the plaintiff to

Captain Costonas on December 23, 2005 requesting a housing transfer within Coxsackie generated a response in which Captain Costonas wrote "[y]ou do not tell me where you should lock in Coxsackie C.F., accordingly, my office will not [sic] further action." *Id.* ¶ 12. In view of plaintiff's allegation that the harassment experienced by him in retaliation for the filing of grievances was ongoing and involved two corrections officers apparently assigned to the B-2 housing unit, the refusal by defendant Costonas of plaintiff's request for a transfer out of that unit could suffice to establish that individual's personal liability. *See Ramos v. Artuz,* No. 00 CIV 0149, 2001 WL 840131, at *8-10 (S.D.N.Y. July 25, 2001) (finding personal involvement by prison official whose involvement extended "beyond the mere receipt of letters" in that he "sent plaintiff numerous letters containing some explanation or justification" regarding the plaintiff's medical complaints). Accordingly, I recommend against dismissal of plaintiff's claims against defendant Costonas at this early procedural juncture.

### C. *Equal Protection*

Plaintiff's second cause of action alleges, in summary fashion, a violation of the Equal Protection Clause of the Fourteenth Amendment. In their motion, defendants seek dismissal of that claim as legally deficient.

The Equal Protection Clause requires that state actors afford the same treatment to persons who are, for material purposes, similarly situated. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove an Equal Protection violation, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he [or she] must demonstrate that his [or her] treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

Plaintiff's complaint in this instance alleges a series of deprivations which he attributes to retaliatory animus stemming from his having lodged complaints against various corrections workers including, principally, defendant Wildermuth. In his pleading, plaintiff does not identify himself as a member of any particular class.[FN5]

> FN5. This deficiency is not necessarily fatal, since an equal protection claim may be established by a person claiming to constitute a class of one who has been subject to invidious discrimination. *See Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) ("While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected class ... [a plaintiff] can still prevail in what is known as a 'class of one' equal protection claim.") (citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000) (per curiam)).

**\*7** While far from artfully drafted, plaintiff's complaint does make at least oblique reference to his race, attributing to defendant Wildermuth a statement, made in connection with his refusal to allow McDonald to participate in recreation on August 24, 2005, to the effect that "ignorant Negro's [sic] like [the plaintiff] should not be allowed outside anyway." *See* Amended Complaint (Dkt. No. 16) ¶ 3. As was previously noted, the court's function at this procedural juncture is to determine, based upon the four corners of his complaint, whether McDonald has stated a plausible claim of Equal Protection denial sufficient to merit the opportunity to offer evidence in support of the claim. *Twombly,* 127 S.Ct. at 1969, 1974; *Patane,* 2007 WL 4179838, at \*3. While I have serious reservations as to whether plaintiff's complaint alleges conduct, including the loss of a single meal and a day of recreation, which arises to a level of constitutional significance, I am unable to conclude at this early procedural stage that plaintiff has not pleaded a colorable Equal Protection claim, particularly in view of statements allegedly attributed to corrections officer Wildermuth which, if true, could be viewed as reflecting race-based animus. *See Figueroa v. Kapelman,* 526 F.Supp. 681, 685 (S.D.N.Y.1981) (indicating that plaintiff's alleged equal protection violations stemming from, *inter alia,* his receipt

of cold meals failed to state a cause of action under the Equal Protection Clause); *but see Maldonado v. Pharo,* 940 F.Supp. 51, 56 (S.D.N.Y.1996) (noting that the use of racial slurs may provide "ample evidence" to survive a motion for summary judgment on an equal protection claim) (citing *Lorenzana v. Mette,* No. 94 C 6861, 1995 WL 461860, at \*5 (N.D.Ill. Aug. 2, 1995) (" '[W]hile derogatory references to racial or ethnic backgrounds by themselves obviously do not rise to the level of a deprivation of constitutional rights ... they do support a finding of racial animus ....' ") (quoting *Bell v. City of Milwaukee,* 746 F.2d 1205, 1259 (7th Cir.1984), *overruled on other grounds, Russ v. Watts,* 414 F.2d 783 (7th Cir.2005))). I therefore recommend against dismissal of plaintiff's Equal Protection claim.

D. *Eighth Amendment*

In their motion, defendants next seek dismissal of plaintiff's third cause of action, which alleges that he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment. In support of that request, defendants argue that the deprivations alleged were *de minimis,* and do not rise to a level sufficient to support an Eighth Amendment violation.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

**\*8** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Plaintiff's cruel and unusual punishment claim is comprised of four distinct elements, alleging 1) a pattern of verbal harassment, including a racial slur, attributed primarily to defendants Wildermuth and Frazier; 2) the denial of one meal; 3) the deprivation of a single period of recreation; and 4) thirty days of keeplock confinement under otherwise normal conditions. It is well-established that the verbal harassment of a prison inmate by prison officials, without more, does not give rise to a cognizable Eighth Amendment claim. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J .) (finding that allegations that corrections officer laughed at and insulted inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.) ("Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation"). Turning to the plaintiff's assertion that he was denied one meal and participation in a single recreation period, these alleged actions, while not necessarily to be condoned, particularly if motivated based upon unlawful considerations, nonetheless are not sufficiently grievous to support an Eighth Amendment cruel and unusual punishment claim. Finally, the allegation that plaintiff was placed in keeplock confinement under otherwise normal conditions for thirty days similarly does not establish a claim of cruel and unusual punishment.[FN6] *See, e.g., Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment.").

> [FN6.] Indeed, keeplock confinement of such a relatively modest duration is generally not regarded as a liberty deprivation sufficient even to trigger the procedural due process requirements of the Fourteenth Amendment. *See Moore v. Senkowski,* No. 93-CV-1052, 1996 WL 191988, at *1-3 (N.D.N.Y. Apr. 15, 1996) (Pooler, J.) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995)).

Having carefully reviewed plaintiff's most recent complaint, filed after having been placed on notice of earlier deficiencies, I conclude that it fails to allege deprivations of a constitutional magnitude, and therefore recommend dismissal of plaintiff's Eighth Amendment cruel and unusual punishment claim.

E. *Retaliation*

**\*9** At the heart of plaintiff's complaint is his claim of unlawful retaliation. Defendants contend that plaintiff's retaliation claim is similarly deficient.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251, (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

As one might gather, evaluation of claims of retaliation is a particularly fact-laden exercise, requiring careful analysis of the plaintiff's claims of protected conduct, the adverse action allegedly taken by the defendants, and the nexus between the two. When engaged in that exercise, a court must view claims of retaliation with "skepticism and particular care" in light of the ease with which claims of retaliation are incanted. *Dawes,* 239 F.3d at 491 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

Standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate conduct of constitutional conduct. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). Plaintiff's further assertion in this case, to the effect that the false misbehavior reports issued to him on August 24 and 30, 2005 were prompted by retaliatory animus, based upon his having engaged in protected activity, however, suffices to state a cognizable claim for retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

Based upon my review of plaintiff's complaint for legal sufficiency, measured against this backdrop, I conclude that he has asserted a plausible claim of retaliation based upon the issuance of allegedly false misbehavior reports in retaliation for his filing of grievances, and thus recommend that he be afforded the opportunity to develop and offer evidence in support of that claim.

### F. Civil Rights of Institutionalized Persons Act

**\*10** Plaintiff's final claim purports to arise under the Civil Rights of Institutionalized Persons Act of 1980, Pub.L. 96-247, 94 Stat. 349 (1980), codified at 42 U.S.C. § 1997 *et seq.* ("CRIPA"). The CRIPA was enacted in 1980 to address

egregious or flagrant conditions which deprive ... [persons confined in qualifying institutions] of any rights, privileges, immunities secured or protected by

the Constitution or laws of the United States causing such persons to suffer grievous harm, and [which] is pursuant to a pattern or practice of resistence to the full enjoyment of such rights, privileges or immunities ...

42 U.S.C. § 1997a(a). In instances where the stringent requirements of the Act are satisfied, the CRIPA confers upon the Justice Department, which prior to its enactment lacked the power to sue on behalf of institutionalized persons, *United States v. Mattson,* 600 F.2d 1295, 1297 (9th Cir.1979), the authority to commence suit in order to seek, as relief, that which has been described in the statute as "the minimum corrective measures necessary to insure [inmates'] full enjoyment of such rights, privileges, or immunities ..." as are guaranteed under the Constitution and federal law. 42 U.S.C. § 1997a(a); *see Messier v. Southbury Training School,* 916 F.Supp. 133, 137 (D.Conn.1996). The determination of whether the specific prerequisites to suit under the CRIPA have been met rests solely within the province of the Attorney General. *Messier,* 916 F.Supp. at 137 n. 2.

The Act defines qualifying institutions falling within its purview to include "a jail, prison, or other correctional facility", 42 U.S.C. § 1997(1)(B)(ii). The Act's purview thus seemingly extends to the DOCS facility at Coxsackie. Defendant maintains that despite this fact, no private right of action exists under the CRIPA, and thus plaintiff's claim under that provision is subject to dismissal.

The determination of whether a private right of action should be inferred from a federal law entails examination of the legislative intent underlying the particular enactment. *Price v. Brittain,* 874 F.2d 252, 262 (5th Cir.1980); *see also Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1561 (1981). In its decision in *Cort v. Ash,* the United States Supreme Court set out guideposts to assist courts in determining whether a private right of action should be inferred from the legislative history supporting a particular statute. 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88 (1975). Under *Cort,* the four factors are identified as relevant to the inquiry, including whether 1) the plaintiff is a member of a class for whose special benefit the statute was enacted; 2) the legislative intent indicates, either explicitly or implicitly, either an intention to create a private remedy or,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

conversely, to deny one; 3) whether the finding of a private right of action would be consistent with the underlying purposes of the legislative fiscal scheme; and 4) whether the cause of action is one historically relegated to state law, addressing an area principally of concern to the state, such that it would be an appropriate to infer a federal private right of action. *Id.* In subsequent cases, the Supreme Court has qualified the *Cort* test by indicating that these four factors do not necessarily carry equal weight, and the "dispositive" question is whether Congress intended to create a private right of action. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249 (1979); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377-78, 102 S.Ct. 1825, 1839 (1982) ("Our cases subsequent to *Cort v. Ash* have plainly stated that our focus must be on the intent of Congress.... The key to the inquiry is the intent of the Legislature." (internal quotation marks and footnote omitted)); *Touche Ross & Co. v. Redington,* 442 U.S. 569, 568, 99 S.Ct. 2479, 2485 (1979). " 'Indeed, the first three factors discussed in *Cort*-the language and focus of the statute, its legislative history, and its purpose-are ones traditionally relied upon in determining legislative intent.' " *Transamerica,* 444 U.S. at 24, 100 S.Ct. at 249 (quoting *Touche Ross & Co.,* 442 U.S. at 575-76, 99 S.Ct. at 2489) (internal citation omitted).

**\*11** Applying the relevant factors, I find no basis to conclude that a private right of action was intended by Congress when enacting the CRIPA. *Cf. Price,* 874 F.2d at 262-64 (finding no private right of action under 42 U.S.C. § 1997d, an anti-retaliation provision included as part of the Act); *Bieros v. Nicola,* 860 F.Supp. 226, 235 (E.D.Pa.1994) (same). By its express terms, the CRIPA authorizes the United States Attorney General, who must personally sign any complaint filed under the Act, to initiate action to seek appropriate redress for violations of the Act. 42 U.S.C. § 1997a(a). While under the Act intervention by the Attorney General in an action commenced "seeking relief from egregious or flagrant conditions which deprive persons residing in institutions of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ...." is permitted, *see* 42 U.S.C. § 1997c, neither this language nor any other portion of the statute evinces an intent by Congress to provide a private right of action to

sue independently under the Act asserting constitutional deprivations which are fully redressable under 42 U.S .C. § 1983. Accordingly, applying the factors identified in *Cort* and its progeny, and particularly in view of the plain language of the statute itself, I recommend a finding that the CRIPA does not provide a private right of action for a prison inmate and, correspondingly, dismissal of plaintiff's fourth cause of action. *Johnson v. Fairman,* No. 95 C 5416, 1997 WL 137179, at \*5 (N.D.Ill. Mar. 24, 1997); *see also Cooper v. Sumner,* 672 F.Supp. 1361, 1367 (D.Nev.1987) (holding that 42 U.S.C. § 1997c, which authorizes the Attorney General to intervene in prisoner civil suits, does not confer a private right of action upon inmates).

## IV. *SUMMARY AND RECOMMENDATION*

Despite having been afforded multiple opportunities to detail his claims with sufficient clarity in order to facially demonstrate the existence of one or more plausible constitutional claims, plaintiff has filed with the court a complaint which is exceedingly concise and bereft of specifics, and which reflects his inability to articulate facts which would sustain an Eighth Amendment cruel and unusual punishment claim. Plaintiff's complaint also asserts a cause of action under the CRIPA, an Act which affords no private right of action. Accordingly, I recommend that plaintiff's third and fourth causes of action be dismissed. In addition to those deficiencies, plaintiff's complaint fails to establish the requisite personal involvement of Coxsackie Superintendent Israel Rivera in the constitutional deprivations alleged. Consequently, that defendant is therefore entitled to dismissal of all claims against him.

Having found, however, that plaintiff has pleaded a colorable claim that through their actions defendants Costonas, Wildermuth and J. Frazier, denied him Equal Protection and engaged in unlawful retaliation against him, I recommend that their motion to dismiss those claims be denied. Accordingly, it is hereby

**\*12** RECOMMENDED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 25) be GRANTED, in part, and that all claims against defendant Israel, as well as plaintiff's third and fourth causes of action against all defendants, be DISMISSED, but that defendants' motion

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)

(Cite as: 2008 WL 268345 (N.D.N.Y.))

otherwise be DENIED and that he be permitted to pursue his Equal Protection and unlawful retaliation claims as against defendants Costonas, Wildermuth and Frazier.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

McDonald v. Rivera
Not Reported in F.Supp.2d, 2008 WL 268345 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.
I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

*1 Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

**H**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE(WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals,

Second Circuit.
Anthony WASHINGTON, Plaintiff–Appellant,
v.
Paul GONYEA, Deputy Superintendent of Monterey Correctional Facility, Individually and in his Official Capacity, Tammi Chaboty, Sergeant at Woodbourne Correctional Facility, Individually and in her Official Capacity, Keith Granger, Sergeant at Livingston Correctional Facility, Individually and in his Official Capacity, Defendants–Appellees.
No. 11–980–CV.

Sept. 10, 2013.

Michael J. Balch, New York, New York, for Plaintiff–Appellant.

Brian A. Sutherland, Assistant Solicitor General of Counsel (Barbara D. Underwood, Solicitor General, Michael S. Belohlavek, Senior Counsel, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, New York, for Defendants–Appellees.

Present DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges, EDGARDO RAMOS, District Judge.FN*

> FN* The Honorable Edgardo Ramos, of the United States District Court for the Southern District of New York, sitting by designation.

SUMMARY ORDER

**\*1 UPON DUE CONSIDERATION,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the order of the District Court is **AFFIRMED IN PART and REVERSED IN PART,** and the case is **REMANDED.**

Plaintiff–Appellant Anthony Washington ("Washington") appeals from a judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*), entered January 31, 2011, granting Defendants–Appellees' motions to dismiss. In an accompanying opinion filed today, we affirm on alternative grounds the district court's dismissal of Washington's claim that Defendants–Appellees substantially burdened his right to free exercise of religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1. In this summary order, we affirm the district court's denial of Washington's due process claim and reverse dismissal of his First Amendment retaliation claims.FN1 We assume the parties' familiarity with the underlying facts and procedural history of the case.

> FN1. Washington did not challenge the district court's dismissal of his conspiracy claim on appeal, and we therefore deem that claim abandoned. *See LoSacco v. City of Middletown, 71 F.3d 88, 92–93 (2d Cir.1995).*

We review the grant of a motion to dismiss *de novo,* accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *See Harris v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Mills,* 572 F .3d 66, 71 (2d Cir.2009). The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Since Washington filed his complaint *pro se,* "it must be construed liberally to raise the strongest arguments it suggests," *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013) (internal quotation marks and alterations omitted), although "a *pro se* complaint must state a plausible claim for relief," *id.*

## I. Due Process Claim

"Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). When a prison disciplinary hearing may impose a punishment sufficient to trigger due process protections, "the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill,* 472 U.S. 445, 454 (1985). In addition, "due process requires 'that there be some evidence to support the findings made in the disciplinary hearing.' " *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992) (quoting *Hill,* 472 U.S. at 457); *see Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004) (explaining that this Court "look[s] to see whether there was 'reliable evidence' of the inmate's guilt" supporting the disciplinary decision).

**\*2** Washington fails to raise a due process claim upon which relief may be granted because his complaint does not plausibly allege that Defendant–Appellee Paul Gonyea's ("Gonyea") disciplinary decision that Washington had "communicat[ed] messages of a personal nature to an employee," thereby violating Rule 107.11, 7 N.Y.C.R.R. § 270.2(B)(8)(ii), lacked the support of at least some reliable evidence.[FN2] Washington's complaint alleges that during the disciplinary hearing Gonyea heard testimony from Defendant–Appellee Tammi Chaboty

("Chaboty"), corroborated by testimony from Defendant–Appellee Keith Granger ("Granger"), that Chaboty "was concerned" when Washington handed her the Quran, that he had an "eerie smile which was unnerving," and that his "conduct [on] the night of the incident seemed inappropriate." The transcript of the proceeding also indicates that Gonyea interviewed the accuser, Chaboty, and in issuing his decision, relied upon Chaboty's written incident report and her testimony.[FN3] Although New York's Third Department found that the disciplinary decision was not based on *substantial* evidence, *Washington v. Selsky,* 48 A.D.3d 864, 865 (3d Dep't 2008) (annulling Washington's disciplinary disposition), Chaboty's testimony and corroborating evidence constituted *some* evidence in support of the decision. Since the decision did not rest on "blatantly implausible" evidence, *Zavaro,* 970 F.2d at 1152, or on hearsay accusations not independently assessed to be credible, *see Pico,* 356 F.3d at 489–90, Washington's due process claim must fail.

> FN2. Rule 107.11 is part of Rule Series 107, which addresses an inmate's "Interference with an Employee or Other Person." 7 N.Y.C .R.R. § 270.2(B)(8). Rule 107.11 provides in full,
>
>> An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee or any other person including a person subject of an order of protection with the inmate or who is on the inmate's negative correspondence list.
>
>> *Id.* § 270.2(B)(8)(ii).
>
> FN3. In considering a motion to dismiss, a court may consider both documents incorporated by reference into the complaint and unincorporated documents that are integral to the complaint and upon which the complaint heavily relies. *Chambers v. Time Warner Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). Here, incorporation of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

transcript is proper because the complaint relies heavily on the hearing transcript.

## II. First Amendment Retaliation Claims

Washington alleges that the Defendants–Appellees violated his First Amendment rights to free exercise of his religion and free speech when they retaliated against him for disseminating religious material to Chaboty. To prevail on a First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983, a prisoner must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that "the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). In determining whether a prisoner's conduct is motivated by a sincerely held religious belief, we do not "evaluate the objective reasonableness of the prisoner's belief;" *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003); rather, our "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature," *id.* (internal quotation marks omitted).

**\*3** The district court erred in dismissing Washington's retaliation claims on the basis that he failed to plead that his act of giving the Quran to Chaboty constituted an exercise of his sincerely held religious beliefs. Washington alleged that he wanted to give Chaboty the Quran "in response to her expressed interest to know about the religion of Islam" and, significantly, that "he felt that he would be remissed [*sic* ] not to give her the book as it is the primary source of Islam." In his affidavit opposing dismissal, Washington stated that he believes it to be his "religious duty to inform others about the religion of Islam, especially those who inquire about it." FN4 Therefore, read liberally and as a whole, the complaint alleges that Washington felt a sincere religious obligation to give the Quran to Chaboty, and while the contours of the burden standard are not precisely drawn, *see Salahuddin,* 467 F.3d at 275 n. 5, the conduct alleged

here—that Washington was severely punished for engaging in protected activity—rises to the level of a substantial burden on the free exercise of religion.

> FN4. Courts "deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013).

Even if Defendants–Appellees substantially burdened Washington's sincerely held religious beliefs, their actions do not constitute a constitutional deprivation if they were "reasonably related to legitimate penological interests." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)); *see Turner v. Safley,* 482 U.S. 78, 89–90 (1987) (articulating three-step analysis for determining reasonableness of a prison regulation). As the district court correctly recognized, assessing the reasonableness of penological interests is a factual and context-specific inquiry that in this case is inappropriate at this preliminary stage of the proceedings. *See Ford,* 352 F.3d at 596; *Salahuddin,* 467 F.3d at 277. Furthermore, Washington alleges that Defendants–Appellees were motivated by personal prejudice and did not act against him for legitimate penological reasons. *See Shakur v. Selsky,* 391 F.3d 106, 116 (2d Cir.2004) (reversing dismissal of prisoner's retaliation claim and noting that "a failure to abide by established procedures or standards can evince an improper objective"). Therefore, accepting the complaint's well-pled factual allegations as true, we conclude that Washington has plausibly alleged that the officers' actions were not reasonably related to legitimate penological interests.

Additionally, we note that Washington alleges that he was denied religious services while in Special Housing Unit ("S.H.U.") pursuant to the discipline imposed by Gonyea. Although assigned pro bono counsel did not argue on appeal that this alleged deprivation constituted a violation of Washington's free exercise rights, our waiver doctrine is prudential, *see In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 133 (2d Cir.2008) (per curiam), and we address that claim here. While the complaint does not specify which official denied him religious services in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

S.H.U., a liberal reading of the complaint gives rise to a plausible inference that Chaboty and Granger were involved either directly or indirectly, and Washington has therefore adequately pled a violation of his First Amendment rights on that basis. On remand, the district court should allow Washington leave to amend his pleadings to add additional defendants if requested.

### III. Qualified Immunity

**\*4** Finally, Defendants–Appellees argue that they are entitled to qualified immunity because their conduct, as alleged, did not violate clearly established statutory or constitutional rights. However, "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir,* 264 F.3d 154, 169 (2d Cir.2001). Here, Washington has plausibly alleged that Defendants–Appellees acted with an improper retaliatory motive. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) ("In order to prevail on his retaliation claims, [plaintiff] bears the burden of showing ... that the [constitutionally protected] conduct was a substantial or motivating factor for the adverse actions taken by prison officials."); Compl. ¶¶ 18, 20, 22, 24, 39. Therefore, at this stage of the proceedings, Washington's allegations are sufficient to require deferral of the issue of qualified immunity.

We have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART,** and the case is **REMANDED** for further proceedings consistent with this order.

C.A.2 (N.Y.),2013.

Washington v. Gonyea
--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet Keith,
Otisville Medical Department, Defendants.
No. 91 CIV. 8135.

Jan. 24, 1994.
MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an inmate
then in confinement at the Federal Correctional Institution
in Otisville, New York ("Otisville"), filed this action for
injunctive relief and damages based upon alleged
violations of his rights under the United States
Constitution, Amendments I, IV, V, VI, IX, and XIII, and
upon violations of various laws and/or regulations
governing prison administration.FN1 The Complaint named
as defendants G.L. Hershberger ("Hershberger"), the
United States Attorney General ("Attorney General"),
Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the
Bureau of Prisons ("BOP"), and the Otisville Medical
Department ("OTV Medical Department") (collectively
"Defendants"). Defendants moved for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure, or, in the alternative, for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set out below, Defendants'
Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint,
pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure, for failure to state a claim upon which relief

can be granted. Rule 12(c) provides:

After the pleadings are closed but within such time as
not to delay the trial, any party may move for judgment
on the pleadings. If, on a motion for judgment on the
pleadings, matters outside the pleadings are presented to
and not excluded by the court, the motion shall be
treated as one for summary judgment and disposed of as
provided in Rule 56, and all parties shall be given
reasonable opportunity to present all material made
pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are
employed for dismissing a complaint for failure to state a
claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a
Rule 12(c) motion to dismiss for failure to state a claim
upon which relief can be granted. See Ad–Hoc Comm. of
the Baruch Black & Hispanic Alumni Ass'n v. Bernard M.
Baruch College, 835 F.2d 980, 982 (2d Cir.1987); see
also Viacom Int'l. Inc. v. Time, Inc., 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R.
Miller, Federal Practice and Procedure ¶ 1367, at 515–16
(1990). Thus, the Court must read the Complaint
generously, drawing all reasonable inferences from the
complainant's allegations. See California Motor Transp.
v. Trucking Unlimited, 404 U.S. 508, 515 (1972).
Moreover, "consideration is limited to the factual
allegations in [the] amended complaint, which are
accepted as true, to documents attached to the complaint
as an exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to documents
either in plaintiff['s] possession or of which plaintiff[ ] had
knowledge and relied on in bringing suit." Brass v.
American Film Technologies, Inc., 987 F.2d 142 (2d
Cir.1993); accord Allen v. Westpoint–Pepperell, Inc., 945
F.2d 40, 44 (2d Cir.1991); Cortec Indus., Inc. v. Sum
Holding L.P., 949 F.2d 42, 47–48 (2d Cir.1991), cert.
denied, 112 S.Ct. 1561 (1992); Frazier v. General Elec.
Co., 930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to state a
claim only if the Court finds beyond a doubt that "plaintiff
can prove no set of facts" to support the claim that
plaintiff is entitled to relief. See Conley v. Gibson, 355
U.S. 41, 45–46 (1957).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

(Cite as: 1994 WL 23069 (S.D.N.Y.))

mentioned by name any of the individual named Defendants. Defs' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have

participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna on 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.

Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))





Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Rodney JOSEPH, Plaintiff,
v.
Brian FISCHER, Commissioner of N.Y.S.D.O.C.S., Jane Doe (a.k.a.Ms. Calero), Commissioner's Hearing Officer, Luis R. Marshall, Superintendent of Sing Sing Corr. Fac., William A. Lee, Deputy Superintendent of Security, Keith Dubray, Acting Director of Special Housing Unit, John Doe (a.k.a.MR. N. Ingenito), Correctional Lieutenant, Jane Doe (a.k.a.MS. C. Cooper), Correctional Officer, John Doe (a.k.a. MR. A Orrico), Correctional Sergeant, James Conway, Superintendent of Attica Corr. Fac., Defendants.
No. 08 Civ. 2824(PKC)(AJP).

Oct. 8, 2009.
*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.
   **\*1** Plaintiff Rodney Joseph brings this action *pro se* under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Person Act ("RLUIPA"), codified at 42 U.S.C. § 2000cc *et seq.,* seeking damages for violations of his rights under the United States Constitution and under RLUIPA, and other relief. Defendants move under Rule 56, Fed.R.Civ.P., for summary judgment in their favor on all of plaintiff's claims. Construing plaintiff's pleadings generously, plaintiff, an inmate, asserts principally the following claims: (1) a misbehavior report was issued to him in retaliation for the actions of the NAACP and prior complaints he made; (2) plaintiff was denied due process of law at a hearing on the charges contained in the misbehavior report; and (3) certain religious materials were unlawfully confiscated from him. Plaintiff asserts other claims which are discussed in the course of this memorandum. Also, he asserts that various defendants had different roles with respect to the claims, including supervisory personnel who failed to act or correct the actions of others. For the reasons explained below, defendants' motion is granted.

BACKGROUND

I. *Facts*
   In considering the motion, the Court accepts non-movant Joseph's version of the facts, as set forth in his verified complaint, dated February 1, 2008, (the "Complaint"), the exhibits submitted by Joseph in opposition to defendants' motion ("Plaintiff's Exh. ___"), and any facts proffered by defendants which Joseph does not dispute.[FN1] The Court draws all reasonable inferences in favor of plaintiff.

> FN1. "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e) (1)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Rule 56(e) requires that affidavits "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

   Plaintiff is an inmate currently incarcerated by the New York State Department of Correctional Services ("DOCS") at the Attica Correctional Facility ("Attica"). (Inmate Transfer History attached as Exhibit M to the Declaration of Neil Shevlin (the "Shevlin Decl.") at RJ 369.) On or about February 23, 2007, while plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing"), plaintiff filed grievance number SS-42482-07 (the "Grievance") with the Inmate Grievance Resolution Committee ("IGRC"). (Grievance No. SS-42482-07 attached as Exhibit D to Shevlin Decl. at RJ 384-85.) In the Grievance, Joseph claimed that on February 18, 2007, Corrections Officer Carrabello, a non-party, denied him "access to the gym, with the NAACP Organization's fund-raiser." (*Id.* at 384) Joseph claimed that this was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

done in retaliation for prior complaints he had filed. (*Id.*) Joseph's Grievance described ongoing retaliation from corrections officers, primarily relating to restrictions placed by officers on the NAACP's efforts to sell greeting cards. (*Id.*) The Grievance also alleged that on February 12, 2007, Corrections Officer Carrabello conducted a pat frisk of plaintiff and told plaintiff: "You and your friends better watch what the fuck you say in your complaints, because you ain't see[n] assaults and attacks yet." (*Id.; see also* Plaintiff's Exh. A, Affidavit of Rodney Joseph, dated February 13, 2007.) None of the defendants in this case were mentioned in the Grievance.

*A. The Misbehavior Report*

**\*2** On March 10, 2007, at approximately 7:30 a.m., defendant Lt. Neil Ingenito ordered defendant Corrections Officer Carmen Cooper to bring plaintiff to the Housing Block A Sergeant's office so that Ingenito could interview plaintiff about the Grievance. (Declaration of Neil Ingenito (the "Ingemto Deck") ¶ 3; Declaration of Carmen Cooper (the "Cooper Deck") ¶ 4; Plaintiff Statements [sic] Pursuant to Local Rule 56.1(b) ("Plaintiff's 56.1 Statement") ¶ 13.) When plaintiff was brought to the sergeant's office, he was frisked, either by Cooper or by Corrections Officer Bonano, a non-party. (*Compare* Cooper Decl. ¶ 5 (stating that Bonano conducted the pat frisk), *with* Memorandum from Cooper contained in the Misbehavior Report Packed attached as Exhibit E to the Shevlin Decl. at RJ 625 ("I pat frisked [Rodney Joseph] prior to an interview with Lt. N. Ingenito").) During this pat frisk the officers found Joseph's wallet, which Cooper then searched. (Cooper Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 15-16.) Cooper found a note in Joseph's wallet (the "Note") which she read and handed to defendant Sgt. Alfonso Orrico. (Cooper Decl. ¶ 5; Plaintiff's 56.1 Statement ¶¶ 15-16; *see also* Declaration of Alfonso Orrico (the "Orrico Deck") ¶ 4; Plaintiff's 56.1 Statement ¶ 16.) Orrico then handed the Note to Lt. Ingenito, who was interviewing plaintiff. (Orrico Decl. ¶ 5; Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 17.)

Plaintiff admitted to Ingenito that he possessed the Note, but the parties dispute whether plaintiff told Ingenito who sent the Note. (Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement" ¶ 17.) It is undisputed, however, that the Note stated, in part:

This is a reminder of what I would like for you to do for me.

(1) Give these two packs to Divine G.

(2) Give these 15 stamps to Divine G and tell him they go to the guy in Marcassi's (sp?) office who sold me the black socks in the locker.

(3) Look in the file cabinet, in the card book that is upside down, find the card in the front and read the note.

(Shevlin Decl. Exh. E at RJ 509.) The Note was signed by someone named "Shakim." (*Id.*)

Plaintiff then provided defendant Ingenito with the combinations to the several locked filed cabinets located in Sing Sing's NAACP office. (Ingenito Decl. ¶ 6; Complaint § V.) At approximately 8:15 a.m., Ingenito and several other corrections personnel searched the NAACP office. (Ingenito Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 20.) That search yielded 19 categories of material the officers considered contraband or items that posed a security threat, all of which were confiscated. (Ingenito Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 20.) The confiscated items included 1136 postage stamps (worth approximately $440), an atlas containing at least one map of New York State and a used color ink cartridge. (Ingenito Decl. ¶ 8; Complaint § V.)

At approximately the same time the search was conducted, plaintiff was attending an event in Sing Sing's chapel. (Complaint § V.) Ingenito ordered Orrico to go to the chapel and escort plaintiff to his cell block. (Ingenito Decl. ¶ 10; Orrico Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 24.) En route from the chapel back to plaintiff's cell block, Orrico told plaintiff that contraband was found in the NAACP office and Orrico asked plaintiff if he wanted to make a statement about the contraband. (Orrico Decl. ¶ 7; Complaint § V.) Plaintiff declined. (Orrico Decl. ¶ 7; Complaint § V.) Upon reaching plaintiff's cell block, Orrico searched plaintiff's net bag and found an undated letter from the plaintiff to the American Rehabilitation Ministries (the "Letter"). (Orrico Decl. ¶ 8; Plaintiff's 56.1

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

Statement ¶ 25.)

*3 The Letter stated:

I am writing to find out more on purchasing a card order from your Ministry. Presently, the Moorish Science Temple of America is an established religious group here in Sing Sing Correctional Facility. We look for many ways to assist the prison population in any way that we can.

At present, we do not have the (cash) funds to purchase the cards to give population. So we would like to know if you would allow us to send stamps in place of a check, or if it is possible that somebody from the outside can send the check for us.

(Shevlin Decl. Exh. E at RJ 142.) The Letter was signed "Min. R. Joseph." (*Id.*)

Orrico then issued to plaintiff an Inmate Misbehavior Report, dated March 10, 2007 (the "Misbehavior Report"). (Shevlin Decl. Exh. E at RJ 506-07.) The Misbehavior Report charged plaintiff with four rules violations: (1) 103.20-unauthorized solicitation to a business; (2) 113.15-unauthorized exchange; (3)113.16-excessive stamps and unauthorized valuable property; and (4) 114.10-smuggling or soliciting others to smuggle. (*Id.*) The Misbehavior Report was signed by Orrico and endorsed by Cooper as an employee-witness. (*Id.*)

That same day, March 10, 2007, pending further investigation, plaintiff was placed on keeplock. Defendants claim that plaintiff was in keeplock for 72 hours, and was released on March 13, 2007. (Ingenito Decl. ¶ 16; Orrico Decl. ¶ 14; Keeplock Pending Investigation Log attached as Exhibit J to Shevlin Decl. at RJ 649.) Plaintiff claims that he was placed in keeplock for six days and was not released until March 16, 2007. (Transcript of Tier III Hearing, dated April 1, 3, 10 and 11, 2007, attached as Exhibit F to the Shevlin Decl. (the "Hearing Tr.") at RJ 176.) I assume the truth of plaintiff's assertion for the purposes of this motion.

B. *Plaintiff's Disciplinary Hearing*

Between March 30 and April 11, 2007, defendant Hearing Officer Ana Calero conducted a Tier III Hearing in connection with the Misbehavior Report. (Declaration of Ana Calero (the "Calero Decl.") ¶ 3; Plaintiff's 56.1 Statement ¶ 32.) At the beginning of the hearing, Calero informed the plaintiff that he would be able to call witnesses and "present any relevant oral or written evidence." (Calero Decl. ¶ 5; Hearing Tr. at RJ 175-76; Plaintiff's 56.1 Statement ¶ 33.) Calero also asked plaintiff for a list of witnesses he would like to call during the hearing. (Hearing Tr. at RJ 177.) Plaintiff identified three DOCS employees, Orrico, Cooper and Ingenito, each of whom he was permitted to call. (*Id.* at RJ 177-78.) Plaintiff also identified several additional individuals; Rev. Samboni, and inmates Murry, Torres, Merchinson, Whitfield and Stuart. (*Id.* at RJ 178, 183-85.) He was permitted to call Rev. Samboni. (*Id.* at RJ 253-74.) [FN2] Calero reviewed the allegations made against plaintiff as set forth in the Misbehavior Report and read into the record the Note, the Letter and a memorandum from Ingenito listing the items taken from the NAACP office. (Calero Decl. ¶¶ 7-8; Hearing Tr. at RJ 186-91.)

> FN2. The reasons for excluding the testimony of witnesses and, indeed, all other claims of an inability to present evidence or cross-examine witnesses will be discussed in the Court's analysis of the due process claim.

*4 At the hearing, Calero questioned plaintiff about the charges against him and allowed him to tell his version of the events before calling any witnesses. (Hearing Tr. at RJ 191-219; Plaintiff's 56.1 Statement ¶ 37.) Plaintiff admitted that the Note was in his wallet (Hearing Tr. at RJ 188), that the Letter to the American Rehabilitation Ministries was his and bore his signature (*Id.* at RJ 192), and that he knew about most of the items confiscated from the NAACP office before the office was searched, including the atlas containing at least one map of New York, the used color ink cartridge, and that there were a number of stamps in the NAACP office. (*Id.* at RJ 205-12.)

Calero then called as witnesses the DOCS employees requested by plaintiff and called Rev. Samboni. (*Id.* RJ 220-51, 253-74, 291-315, 341-50). In addition, Calero

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

called as witnesses an Imam working at Sing Sing (*id.* at RJ 275-87), and Mr. Folsom, the NAACP staff advisor (*Id.* 335-41.) Plaintiff was allowed to question the witnesses, however, Calero did not allow plaintiff to ask some questions which she believed were immaterial or irrelevant. (Calero Decl. ¶ 12.) During the hearing, Officer Calero reviewed the documents plaintiff sought to introduce. Plaintiff was allowed to submit some documents in his defense (Hearing Tr. at RJ 328-31), but Officer Calero did not permit plaintiff to submit others (*e.g., id* at RJ 213-15, 288-89.)

At the conclusion of plaintiff's Tier III hearing, Calero found him guilty of all four violations and sentenced him to six months in a Special Housing Unit ("SHU"), with two months suspended. (*Id.* at RJ 357.) Officer Calero also sentenced plaintiff to loss of packages, loss of phone privileges and loss of commissary privileges for six months, with two months suspended. (*Id.* at RJ 357-58.)

It is DOCS' practice that inmates who receive an SHU sentence of 90 days or more are transferred from Sing Sing to the SHU at Upstate Correctional Facility ("Upstate SHU"). (Declaration of William Lee (the "Lee Decl.") ¶ 7; Plaintiff's Rule 56.1 Statement ¶ 46.) Plaintiff entered the Upstate SHU on or about April 11, 2007, and was scheduled to be released on August 11, 2007. (Declaration of Keith Dubray (the "Dubray Decl.") ¶ 7; Inmate Disciplinary History, attached as Exhibit K to the Shevlin Decl. at RJ 1-2). Because of good behavior, plaintiff's SHU incarceration was reduced by 19 days. (Dubray Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 48.) Plaintiff's privileges were restored and he was released on or about July 23, 2007. (Dubray Decl. ¶ 7; Plaintiff's 56.1 Statement f 48.) Plaintiff was confined to SHU and had his privileges revoked for 104 days (inclusive of July 23, 2007).

## C. *Plaintiff's Appeals*

Defendant Luis Marshall is the Superintendent of Sing Sing and has held that position since January 5, 2007. (Declaration of Luis Marshall (the "Marshall Decl.") ¶ 2.) Plaintiff sent two letters to defendant Marshall, on March 13 and April 4, 2007. (Letter dated March 13, 2007, attached in Exhibit I to the Shevlin Decl. at RJ 97-99; Letter dated April 4, 2007, attached in Exhibit L to the

Shevlin Decl. at RJ 100-01.) Plaintiff also claims that he sent defendant Marshall another letter on April 15, 2007, but neither party has attached a copy of that letter. (Complaint § VII(F)(2)(c).) Plaintiff's March 13, 2007 letter asked Marshall to "intervene so that [plaintiff] may receive a fair and impartial hearing." (Shevlin Decl. Exh. I at RJ 97.) In that letter, plaintiff also stated that:

**\*5** This misbehavior report derived from an interview that I had with Lt. Ingenito on March 10, 2007, whereas a chain of events transpired when I told him that I will write another complaint because memo's [sic] are still not being honored and harassment is continuing by said officers. I guess he did not like me telling him this, since it was my third interview on this one complaint (understandable).

(*Id.*) On April 3, 2007, Marshall responded, "it is noted that you have a Tier III report pending, therefore, your defense should be presented to the hearing officer for consideration. Any evidence or statements in your defense must be turned in at your hearing or submitted" during any subsequent appeal. (Letter dated April 3, 2007, attached in Exhibit I to the Shevlin Decl.)

In the April 4, 2007 letter, plaintiff claimed that he was not receiving a fair and impartial hearing on the Misbehavior Report. (Letter dated April 4, 2007, attached in Exhibit L to the Shevlin Decl. at RJ 100.) Plaintiff then asked that the Misbehavior Report be dismissed "on the grounds that it was rooted in retaliation and written on assumptions not facts." (*Id.*) Plaintiff also stated that "[i]t is because of the grievance complaint that I filed, I am being punished and this is not only wrong, but Unconstitutional. The very fact that Lt. Ingenito re-interviewed me (a 3rd time) in regards to my harassment grievance ... [makes] the retaliatory nature of this entire proceeding ... obvious." (*Id.* at RJ 100-01.)

In response to this letter, defendant William Lee, the Deputy Superintendent for Security at Sing Sing, reviewed the documents generated as part of plaintiff's hearing. (Lee Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 57.) Lee determined that the hearing was conducted properly, refused to reverse the hearing officer's decision and informed the plaintiff that he could appeal the decision. (Lee Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 57.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

Defendant Fischer was Superintendent of Sing Sing from May 4, 2000, through January 1, 2007. (Declaration of Brian Fischer (the "Fischer Decl.") ¶ 2.) On November 28, 2006, the NAACP organization at Sing Sing sent Fischer a letter stating that certain corrections personnel (none of whom are defendants here) had prevented plaintiff and other members of the NAACP from selling greeting cards. (Plaintiff's Exh. K, November 28, 2006 Letter to Brian Fischer.) The letter did not state that this was done in retaliation for anything. (*Id.*) In a second letter to Fischer, which is undated but must have been sent after plaintiff was transferred to Attica, plaintiff complained that he was told the only job assignment he would receive while at Attica was one working the "lawns & grounds or porter." (Plaintiff's Exh. J, Undated Letter to Brian Fischer.) That letter also stated that Program Committee Chairman Roach had "taken it upon himself to give [plaintiff] additional disposition charges without due process." (*Id.*) Fischer never responded to this second letter. (Fischer Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 53.)

**\*6** Fischer is now Commissioner of DOCS, a position he has held since January 2, 2007. (Fischer Decl. ¶ 2.) As Commissioner, Fischer is responsible for reviewing inmate appeals from disciplinary hearings. (Fischer Decl. ¶ 6; Plaintiff's 56.1 Statement ¶ 52.) As was his routine practice, Fischer did not review plaintiff's appeal. (Fischer Decl. ¶ 2; Plaintiff's 56.1 Statement ¶ 52.) He delegated this responsibility to defendant Keith Dubray, the Acting Director of DOCS' Special Housing/Inmate Disciplinary Program. (Fischer Decl. ¶ 2; Plaintiff's 56.1 Statement ¶ 52.)

On June 20, 2007, Acting Director Dubray affirmed Officer Calero's determination. (Appeal Packet attached as Exhibit H to Shevlin Decl. at RJ 3.) In deciding to affirm Officer Calero's determination, Dubray reviewed: (1) Officer Calero's summary of the evidence and her analysis of the case; (2) the Misbehavior Report; (3) the Note found in plaintiff's wallet; (4) the Letter from plaintiff to the American Rehabilitation Ministries; (5) Lt. Ingenito's March 10, 2007 memorandum setting forth the items confiscated from the NAACP office; and (6) the Witness Interview Notice on which Officer Calero listed the witnesses she did not allow plaintiff to call and her reasons

for denying his request. (Dubray Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 47.) Dubray did not listen to the audio tapes of plaintiff s hearing. (Dubray Decl. ¶ 6; Plaintiff's 56.1 Statement ¶ 47.)

### D. *Plaintiff's Grievances at Attica*

Upon his completion of time in upstate SHU, plaintiff was transferred to Attica. After plaintiff was transferred to Attica, certain materials were confiscated from him and he was issued a second misbehavior report (the "Second Misbehavior Report") for possessing certain of these materials related to the religious group Nations of Gods and Earths. (Complaint § V; Second Misbehavior Report attached as Exhibit V to the Shevlin Decl. at RJ 700.) The Complaint does not provide details but merely states that at Attica, on or about "August 2, 2007 when the plaintiff was given his property, all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV; *see also* Complaint § V stating that plaintiff "had his Holy Quran along with all of his religious material, tapes and headwear confiscated from him. He was also given another misbehavior report for having said religious material.")

The Second Misbehavior Report was issued to plaintiff on or about August 2, 2007. (Complaint § IV; Shevlin Decl. Exh. V at RJ 700.) At the conclusion of plaintiff's hearing on the Second Misbehavior Report he received a sentence of 30 days confinement, the entirety of which was suspended. (Transcript of Tier II Hearing, dated August 8, 2007, attached as Exhibit W to the Shevlin Decl. at 9:5-8; Plaintiff's 56.1 Statement ¶ 85.)

**\*7** On or about August 17, 2007, plaintiff filed grievance number A-52355-07, in which he alleged that after he arrived in Attica and received his personal property, plaintiff was told that he could not have his religious cassette tapes because he did not have a "radio," (presumably, meaning a tape player). (Grievance No. A-52355-07, attached as Exhibit R to the Shevlin Decl. at RJ 445.) Plaintiff was required to send his tapes to his home. (*Id.*) This grievance was appealed to the Superintendant of Attica, defendant James Conway, who denied the grievance. (Declaration of James Conway (the

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

"Conway Decl.") ¶ 14; Plaintiff's Rule 56.1 Statement ¶ 68.) Plaintiff appealed this decision to the Central Office Review Committee (the "CORC"), the final level of administrative appeal for an inmates grievance, which upheld Conway's determination. (Shevlin Decl. Exh. R at RJ 437.)

On August 17, 2007, plaintiff filed grievance number A-52360-07 in which he stated that on August 15, 2007, he appeared before Attica's Program Committee and was told that he would not be given any "positive job assignments such as clerk, Teacher's Aide etc.," but that he would be allowed to work on the lawns or placed on the waiting list to work as a porter. (Grievance No. A-52360-07, attached as Exhibit O to the Sheviin Decl. at RJ 455.) According to this grievance, plaintiff was denied the job of his choosing because of the first Misbehavior Report. (Id.) This grievance was denied by the IGRC. (Id. at RJ 453) On August 28, 2007, based on an investigation by Superintendent Conway's staff, Conway affirmed the IGRC's decision. (Conway Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 61.) On August 29, 2007, plaintiff appealed Conway's decision to the CORC, which affirmed the decision. (Conway Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 61.)

Plaintiff filed three grievances at Attica concerning his religious headwear. Two of these grievances, grievance number A-52987-08, dated January 7, 2008, and a resubmitted grievance also numbered A-52987-08, but dated February 6, 2008, allege that upon his arrival at Attica, plaintiff's religious headwear was placed with his art supplies, and he was told he had to send them home. (Grievance Nos. A-52987-08 attached in Exhibit T to the Sheviin Decl. at RJ 465-66.) The denials of these grievances were affirmed by CORC on April 23, 2008. (Sheviin Decl. Exh. T at RJ 456; Plaintiff's 56.1 Statement ¶ 77.)

In a third grievance filed by plaintiff-grievance number A-52357-07-plaintiff complained that he "was informed by Correctional Staff that one of my religious head wear could not be worn." (Grievance No. A-52357-07 attached as Exhibit S to Sheviin Decl. at RJ 436.) That grievance does not state that plaintiff's headwear was confiscated. (Id.) Its denial was affirmed by

CORC on October 17, 2007. (Shevlin Decl. Exh. S at RJ 427; Plaintiff's 56.1 Statement ¶ 72.)

II. *Procedural History*

**\*8** Plaintiff filed the Complaint, *pro se,* on March 31, 2008. (Docket No. 2.) Defendants filed their answer on August 18, 2008, and they filed an amended answer on August 22, 2008. (Docket Nos. 20, 22.) On September 5, 2008, plaintiff filed an amended complaint, in which he amended this action's caption, but did not change any of the substantive allegations. (Docket No. 25.) [FN3] That same day, plaintiff also filed an unverified "opposition" to defendants' answer. (Docket No. 24.)

> FN3. Because the Complaint and the amended complaint are substantively identical, the Court need not address whether the amendment was valid under Rule 15(a), Fed.R.Civ.P. The Court's discussion below applies to both pleadings.

On December 1, 2008, defendants filed a memorandum of law in support of their motion for summary judgment ("Defendants' Motion") with accompanying materials, and their notice to pro se litigant who opposes summary judgment pursuant to Local Rule 56.2. (Docket Nos. 32-35.) Plaintiff filed an opposition to defendants' motion for summary judgment with accompanying exhibits and a Local Rule 56.1 Statement on January 16, 2009. Defendants filed their reply on February 20, 2009. (Docket No. 38.)

### DISCUSSION

I. *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

exists." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* If the movant meets this burden, by asserting facts demonstrating that the non-movant's claim cannot be sustained, the non-movant must "set out specific facts showing a genuine issue for trial," and cannot rest on mere allegations or denials of the facts asserted by the movant. Rule 56(e)(2), Fed.R.Civ.P. This requires only "a limited burden of production," but, nevertheless, the non-movant "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (citing *Aslanidis v. United States Lines. Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal quotation marks and citations omitted). The Court must read a pro se party's submissions liberally, especially when a defendant moves for summary judgment on a pro se plaintiff's claims. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment").

II. *Retaliation Claim Against Defendants Ingenito, Orrico and Cooper*

**\*9** The Complaint may fairly be construed as asserting a claim under 42 U.S.C. § 1983, against Lt. Ingenito, Sgt. Orrico and Corrections Officer Cooper for issuing the Misbehavior Report in retaliation for earlier complaints made by the NAACP and the February 23, 2007 Grievance filed by plaintiff. To prevail on a retaliation claim under section 1983, a plaintiff bears the initial burden of showing, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the

adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003).

Once the plaintiff has satisfied his initial burden, the burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. *Id.* The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (per curiam).

The Second Circuit has cautioned that, because prisoner retaliation claims can be easily fabricated, courts should "examine prisoners' claims of retaliation with skepticism and particular care ." *Colon,* 58 F.3d at 872. The plaintiff must provide something more than "non-conclusory allegations." *Bennett,* 343 F.3d at 137.

Plaintiff has satisfied the first necessary element of his claim because the act of filing a grievance is constitutionally protected petitioning activity. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983"). Defendants concede this. (Defendants' Motion at 4.)

Plaintiff has provided sufficient evidence which, if believed, would demonstrate that retaliation was a motivating factor in the issuance of the Misbehavior Report. Plaintiff submitted an affidavit to which he swore on February 13, 2007, a few weeks before he received the Misbehavior Report, (Plaintiff's Exh. A.) In that affidavit, plaintiff claimed that two corrections officers, who are not defendants in this action, threatened him and told him to watch what he was saying in his complaints. (*Id.* ¶ 3.) Also, in January 2007, plaintiff complained about retaliation against the NAACP for the complaints it had filed. (Shevlin Decl. Exh. H at RJ 55.)

In addition, when analyzing whether plaintiff has demonstrated that his protected conduct was a substantial or motivating factor the prison officers' actions, the Court may consider the "temporal proximity" of the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

retaliatory misbehavior report to the grievance plaintiff filed. *Gayle,* 313 F.3d at 683 ("We have held that the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."). Plaintiff filed several grievances beginning in 2006, including one on February 23, 2007 (dated February 18, 2007). (Shevlin Decl. Exh. D at RJ 384.) Plaintiff was issued the Misbehavior Report less than three weeks later, on March 10, 2007. (Shevlin Decl, Exh. E at RJ 506-07.) Finally, it is undisputed that plaintiff was the only member of the NAACP who was charged with the contraband found in that office. (Ingenito Decl. ¶ 15; Plaintiff's 56.1 Statement ¶ 13.) This evidence is sufficient, at this stage, to satisfy plaintiff's initial burden.

*10 Summary judgment may be granted to defendants Ingenito, Cooper and Orrico only if they demonstrate that plaintiff would have received the same punishment regardless of any retaliatory motive. *See Gayle,* 313 F.3d at 682. The Misbehavior Report charged that plaintiff possessed a letter in which the author requested "another individual to give 'two packs' of cigarettes to a third individual as well as '15 stamps' to the same 3rd individual as payment to a fourth individual as payment for socks." (Misbehavior Report at RJ 506.) It is undisputed that plaintiff possessed this Note (Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 17; Hearing Tr. at RJ 188), and that the Note stated, in part: "This is a reminder of what I would like for you to do for me. (1) Give these two packs to Divine G. (2) Give these 15 stamps to Divine G and tell him they go to the guy in Marcassi's (sp?) office who sold me the black socks in the locker." (Shevlin Deck Exh. E at RJ 509.)

The Misbehavior Report further charges that plaintiff possessed a letter "soliciting cards from a vendor in exchange for postage stamps." (Misbehavior Report at RJ 506.) It is undisputed that plaintiff possessed the Letter, signed by him and addressed to the American Rehabilitation Ministries, which stated: "I am writing to find out more on purchasing a card order from your Ministry." (Shevlin Deck Exh. E at RJ 142; Hearing Tr. at RJ 192.) The letter also stated: "At present, we do not have the (cash) funds to purchase the cards to give population. So we would like to know if you would allow us to send stamps in place of a check, or if it is possible

that somebody from the outside can send the check for us." (Shevlin Decl. Exh. E at RJ 142.)

The final charge in the Misbehavior Report is that during a search of the "NAACP office, of which Joseph is an official" numerous items of contraband were found. (Misbehavior Report at RJ 506.) It is undisputed that prior to the search of the NAACP office, plaintiff was aware of the following items, all of which were confiscated because they were contraband or posed a potential security threat: video tapes; computers disks; two computers; blank copy tickets; blank picture tickets; a newspaper article pertaining to Sing Sing; a copy of the yellow pages; black ink cartridges; a used color ink cartridge; a memorandum from plaintiff to the Ossining chapter of the NAACP; an atlas containing a map of New York state; and the NAACP's supply of stamps (although plaintiff was not aware of the precise number of stamps). (Plaintiff's 56.1 Statement ¶¶ 20, 37; Hearing Tr. at RJ 205-12; Ingenito Decl. ¶ 7.)

The Misbehavior Report concludes; "The presence of the contraband items in the NAACP office and the letters indicating Joseph's intended use of the stamps establishes his conspiracy to participate in an unauthorized exchange, posses [s] unauthorized valuables, and solicit[ ] goods from an unauthorized source via an unauthorized method of payment." (Misbehavior Report at RJ 506-07.) As stated above, plaintiff admitted to possessing the Letter, the Note and that he was aware of contraband in the NAACP office. Defendants have satisfied their burden of proving that plaintiff committed the prohibited conduct charged in the Misbehavior Report and, therefore, have satisfied their burden of demonstrating that plaintiff would have received the same punishment regardless of any retaliatory motive. In view of this undisputed evidence, no reasonable jury could find in plaintiff's favor on this claim. Therefore, the Court grants summary judgment in favor of defendants Ingenito, Cooper and Orrico on the retaliation claim asserted against them.

### III. *Denial of Due Process Rights*

#### A. *Hearing Officer Calero*

*11 Plaintiff claims that Hearing Officer Calero

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

deprived him of his due process rights during his hearing on the Misbehavior Report. (Complaint §§ III ¶ 7, IV, V and VI.) To establish the claim, plaintiff must show: ' "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " _Giano v. Selsky,_ 238 F.3d 223, 225 (2d Cir.2001) (quoting _Giano v. Selsky,_ 37 F.Supp.2d 162, 167 (N.D.N.Y.1999)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life ....' " _Palmer v. Richards,_ 364 F.3d 60, 64 (2d Cir.2004) (quoting _Sandin v. Conner,_ 515 U.S. 472, 484 (1985)) (alteration in original). In determining whether a particular confinement imposes an atypical or significant hardship, the Court must consider both the duration of confinement and the conditions of confinement. _Id._

Plaintiff was confined for 104 days. (Dubray Decl. ¶ 7.) "Where the plaintiff was confined for an intermediate duration-between 101 and 305 days-'development of a detailed record' of the conditions is required" to determine if the conditions were atypical or a significant hardship. _Palmer,_ 364 F.3d 64-65. Neither plaintiff nor defendants provided the Court with information sufficient to develop a detailed record of plaintiff's SHU conditions. "In the absence of a detailed record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short-less than the 30 days that the _Sandin_ plaintiff spent in SHU-and there was no indication that the plaintiff endured unusual SHU conditions." _Id._ at 65-66. Because neither party has provided this Court with information sufficient to assess the conditions of confinement, the Court will draw the inference in favor of non-movant plaintiff, and assume that plaintiff's conditions were atypical or a significant hardship. Therefore, plaintiff possessed a liberty interest in not being confined in SHU and defendant Calero is entitled to summary judgment only if she can demonstrate that she did not use an insufficient process to deprive plaintiff of his liberty interest.

"The due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a

defendant in a criminal prosecution." _Sira v. Morton,_ 380 F.3d 57, 69 (2d Cir.2004) (quoting _Wolf v. McDonnell,_ 418 U.S. 539, 556 (1974)). "The only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in" _Wolf._ _Shakur v. Selsky,_ 391 F.3d 106, 119 (2d Cir.2004) (emphasis omitted). In a hearing, those minimal due process guarantees are; (1) advance written notice of the charges against the prisoner; (2) a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence the hearing officer relied upon. _Sira,_ 380 F.3d at 69.

**\*12** Plaintiff's hearing took place over several days between March 30, 2007 and April 11, 2007. (Calero Decl. ¶ 3; Plaintiff's 56.1 Statement ¶ 32.) There is no claim that plaintiff did not receive prior written notice of the charges against him or a written statement of the facts underlying the hearing's disposition. (Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 29.) Plaintiff alleges, however, that he did not have a reasonable opportunity to call witnesses and introduce documentary evidence and that officer Calero was not fair and impartial. (Complaint §§ III, ¶ 7, IV, V and VI.) Reading plaintiff's Complaint liberally, it also may be read to challenge the sufficiency of the evidence Officer Calero relied upon in reaching her determination. (_Id._)

**1.** _Sufficiency of Evidence_

"[J]udicial review of the written findings required by due process is limited to determining whether the disposition is supported by" some reasonable evidence. _Sira,_ 380 F.3d at 69. As stated above, plaintiff admitted to the factual predicates for all the violations he was charged with. (Hearing Tr. at RJ 188, 192, 205-12.) In addition, plaintiff's own witness, Rev. Samboni, one of the three chaplains who oversaw all religious groups at Sing Sing, testified that: (1) all inquiries about purchasing greeting cards had to go through the "Dep of Programs;" (2) the senior chaplains in Sing Sing make the purchase orders; and (3) Rev. Samboni would not have approved the Letter if it had been presented to him. (Hearing Tr. at RJ 266-68.) The Sing Sing Imam, who supervised plaintiff's religious group, the Moorish Science Temple of America,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

agreed that solicitations had to be approved by the "Dep of Programs" and that he would not have approved the Letter. (Hearing Tr. at RJ 278-79.) In addition, Sgt. Orrico testified that inmates are not permitted to barter stamps for goods. (Hearing Tr. at RJ 314-15.) The testimony of the witnesses, along with plaintiff's admissions, satisfy the requirement that the written determination be supported by some reasonable evidence.

2. *Right to Call Witnesses*

Plaintiff also challenges the failure to call certain witnesses who he requested be called. A hearing officer may refuse to allow a prisoner to call a witness or introduce documentary evidence if that witness or evidence would be irrelevant or unnecessary. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingslev v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991).

Plaintiff asked to call nine witnesses. (Hearing Tr. at RJ 177-78, 183-85.) He was permitted to call four: Lt. Ingenito, Reverend Samboni, Sgt. Orrico and Corrections Officer Cooper. (Hearing Tr. RJ 220-51, 253-74, 291-315, 341-350). In addition, Officer Calero called two witnesses on her own initiative, the facility Imam, (*id.* at RJ 220-49, 275-87), and the NAACP staff advisor, Mr. Folsom (*id.* at 220-49, 335-41). Plaintiff was allowed to question all of these witnesses.[FN4]

> FN4. To the extent that the Complaint asserts that plaintiff's due process rights were violated because Officer Calero prevented plaintiff from asking the witnesses certain questions because they were irrelevant or unnecessary, those allegations fail to state a claim. *Kalwasinski,* 201 F.3d at 109 ("Nor does an inmate have a constitutional right of confrontation.").

**\*13** Defendant Calero did not allow plaintiff to call as witnesses inmates Murry, Torres, Merchinson, Whitfield and Stuart on the grounds that their testimony would have been irrelevant. (Hearing Tr. at RJ 356; Shevlin Decl. Exh. H at RJ 31-32.) Plaintiff stated that he wanted to call inmates Murry, Torres and Merchinson because Murry "was locked up for similar things" on the same day

plaintiff was confined, and because all three would have been able to testify about the distribution of the greeting cards plaintiff was alleged to have solicited. (Hearing Tr. at RJ 183-86.) Plaintiff was charged with a violation of rule 103.20, 7 N.Y.C.R.R. § 270.2(4)(ii), which provides, "[a]n inmate shall not request or solicit goods or services from any business or any person other than an immediate family member without the consent and approval of the facility superintendent or designee." He was charged with violating this rule because he had a letter, "signed by [him], soliciting cards from a vendor in exchange for postage stamps." (Misbehavior Report at RJ 506). Because rule 103.20 prohibits solicitation, and not the actual purchase of goods or services, Officer Calero had a rational basis for excluding witnesses Murry, Torres and Merchinson, whose testimony would have been limited to how plaintiff would have paid for the cards. *Scott v. Kelly,* 962 F.2d 145, 147 n. 2 (2d Cir.1992) ("We must defer to the judgment of prison officials in balancing prisoners' rights against penological interests, absent a showing of abuse of discretion.").

Plaintiff also asked to call inmates Whitfield and Stuart because they were members of the NAACP's Executive Board and because they worked in the NAACP office. (Hearing Tr. at RJ 185-86.) In the Complaint, plaintiff alleges that inmates Whitfield and Stuart would have testified as to what the NAACP was allowed to possess. (Complaint § V.) He did not give this reason to officer Calero during the hearing.

Plaintiff was charged with a violation of rule 113.16, 7 N.Y.C.R.R. § 270.2(14)(vi), which provides that "[a]n inmate shall not be in possession of stamps in excess of $22.50 in value, money, credit card, credit card numbers, check or unauthorized valuable or property." The basis for this charge was that he was an official of the NAACP and the excess stamps and unauthorized items were found in the NAACP's office. (Misbehavior Report at RJ 506.) At his hearing, plaintiff testified that he and the four other NAACP Executive Board members would drop off two or three stamps in a communal box after every time each went to the commissary. (Hearing Tr. at RJ 207-08.) In addition, plaintiff testified that other members of the NAACP also would drop off stamps in the communal box. (*Id.*) Finally, plaintiff testified that he was aware of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

blank copy tickets in the NAACP office, which are the equivalent of money within the facility. (*Id.* at RJ 206-07, 211; Ingenito Decl. ¶ 9; Plaintiff's 56.1 Statement ¶ 22.) Given these admissions, it was not an abuse of discretion for Officer Calero to determine that inmates Whitfield's and Stuart's testimony would have been irrelevant or unnecessary. In addition, it was unnecessary to call these witnesses to testify about what the NAACP was allowed to possess because Officer Calero allowed plaintiff to provide that testimony. (Hearing Tr. at RJ 212.)

### 3. *Documentary Evidence*

**\*14** Plaintiff also alleges that he was denied the right to present certain documentary evidence at the hearing. Officer Calero excluded certain documents because they were not relevant to the charges against plaintiff. (Hearing Tr. at RJ 213-15, 288-90.) From the transcript, and the documents attached to the Appeal Report (Shevlin Decl. Exh. H), it appears that these documents related to defendant's retaliation defense. (*Id.*) Indeed, plaintiff makes this clear in his 56.1 Statement in which he claims that all of the documents he wished to introduce would "show a pattern of retaliation against the plaintiff due to the fact that the plaintiff's name is included on all of them." (Plaintiff's 56.1 Statement ¶ 43.) Because plaintiff did not claim at the time of the hearing, (nor does he claim now) that these documents addressed the actual charges against him, it was not an abuse of discretion for Officer Calero to exclude them,

### 4. *Right to Impartial Hearing Officer*

The only allegation contained in the complaint directly addressing Calero's impartiality is that she "denied plaintiff a fair and impartial hearing," and "took it upon herself to deny the plaintiff's Constitutional Rights to Due Process." (Complaint § III, ¶ 7.) This conclusory allegation is insufficient to show that Calero was not impartial. *See Gill v. Mooney,* 824 F.2d 192, 194-95 (2d Cir.1987) ("recognizing the possibilities for abuse in claims of this sort, we have insisted on a higher level of detail in pleading them and have held that a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone") (quotation marks and citation omitted).

Based on the foregoing, defendant Calero is entitled

to summary judgment in her favor.

### IV. *Lee, Dubray, Fischer and Marshall*

A defendant must be personally involved in a constitutional deprivation to be liable under section 1983. The Supreme Court's recent decision in *Iqbal v. Ashcroft,* addressed this requirement, 129 S.Ct. 1937 (2009). In *Iqbal,* the Supreme Court examined a *Bivens* claim against two high-ranking federal government officials. *Id.* at 1942.[FN5] According to the Court, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. The Court specifically rejected the respondent's argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," because that "conception of 'supervisory liability' is inconsistent with [respondent's] accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents." *Id.* at 1949. In fact, "[i]n a § 1983 suit or a *Bivens* action-where masters do not answer for the torts of their servants-the term 'supervisory liability' is a misnomer." *Id.* Accordingly, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* Thus, under *Iqbal,* a defendant can be liable under section 1983 only if that defendant took an action that deprived the plaintiff of his or her constitutional rights. A defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right.[FN6]

FN5. The Court noted that "[i]n the limited settings where *Bivens* does apply, the implied cause of action is the 'federal analog to suits brought against state officials under [section] 1983].' " *Id.* at 1948 (quoting *Hartman v. Moore,* 547 U.S. 250, 254 (2006)).

FN6. *See Bellamy v. Mount Vernon Hospital,* No. 07 Civ. 180I(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (Scheindlin, J.) (*"Iqbal's* 'active conduct' standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation.... [A] supervisor is only

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."); *Spear v. Hugles,* No. 08 Civ. 4026(SAS), 2009 WL 2176725 (S.D.N.Y. July 20, 2009); *see also Young v. State of New York Office of Mental Retardation and Developmental Disabilities,* 649 F.Supp.2d 282, 2009 WL 2749783 (S.D.N.Y. Aug. 27, 2009) (Kaplan, J.) ("Precisely what remains of the Second Circuit [personal involvement] rule in light of *Iqbal* is not entirely clear.").

A. *Lee*

**\*15** Plaintiff alleges that defendant Lee "reviewed the Discretionary Review Letter that was submitted to the Superintendent and failed to take corrective measures." (Complaint § III, ¶ 4.) The "Discretionary Review Letter" appears to be a letter dated April 4, 2007, that plaintiff sent to Superintendent Marshall, in which plaintiff stated that he was not receiving a fair and impartial hearing regarding the Misbehavior Report. (Lee Decl. ¶ 3.) Specifically, plaintiff asked that the Misbehavior Report be dismissed "on the grounds that it was rooted in retaliation and written on assumptions not facts." (Shevlin Decl. Exh. L at RJ 100 .) Plaintiff also stated that "[i]t is because of the grievance complaint that I filed, I am being punished and this is not only wrong, but Unconstitutional. The very fact that Lt. Ingenito re-interviewed me (a 3rd time) in regards to my harassment grievance ... [makes] the retaliatory nature of this entire proceeding ... obvious." (*Id.* at RJ 100-01.)

Although the letter was addressed to defendant Marshall, Lee responded. In preparing his response, defendant Lee reviewed the documents generated as part of the hearing and determined that the hearing was conducted properly. (Lee Decl. ¶ 5.) He responded to plaintiff's letter on April 17, 2007. (April 17, 2007 Memorandum attached in Exhibit L to the Shevlin Decl.) In that response, defendant Lee refused to reverse Hearing Officer Calero's decision, and informed the plaintiff that he could appeal the decision. (Lee Decl. ¶ 5.)

Lee cannot be held liable under a retaliation theory

for failing to reverse Hearing Officer Calero's determination, even though there was some evidence that the Misbehavior Report was written in retaliation for plaintiff's earlier complaints. Under *Iqbal,* a government official is only liable under section 1983 if that official's "own individual actions ... violated the Constitution." *Iqbal,* 129 S.Ct. at 1948. Plaintiff's claim, based on Lee's "failure to take corrective measures," is precisely the type of claim *Iqbal* eliminated. *Id.* at 1948-49. And Lee's independent conduct of reviewing a grievance determination does not make him liable for the alleged improper conduct that underlies that grievance. Finally, because plaintiff's hearing satisfied the requirements of due process of law, Lee cannot be held liable under section 1983 for deprivation of due process.

B. *Dubray*

The only basis of liability asserted by plaintiff against Dubray is that "he review[ed] the Appeal of the plaintiff and failed to take corrective measures, he Affirmed [sic] the Appeal." (Complaint §§ III, ¶ 5, V.) Construing the Complaint liberally, this allegation may be read as asserting a claim that Dubray violated plaintiff's due process rights by affirming Officer Calero's decision. But, because there was no due process violation in plaintiff's disciplinary hearing, defendant Dubray cannot be held liable for failing to correct a non-existent violation. In addition, as with defendant Lee, Dubray cannot be held liable for affirming Officer Calero's determination even if there was some evidence the Misbehavior Report was written in retaliation for plaintiff's complaints. This is not the type of action *Iqbal* requires. Therefore, defendant Dubray is entitled to summary judgment.

C. *Fischer*

**\*16** Plaintiff alleges that defendant Fischer is liable under section 1983 because: (1) he oversees DOCS; (2) Fischer "was the (former) Superintendent of Sing Sing" at the time plaintiff filed complaints against personnel at Sing Sing; and (3) "[h]e had knowledge of all activities [taking] place but failed to intervene to correct the errors." (Complaint § III, ¶ 2.) None of these allegations states that Fischer ever took any action that deprived plaintiff of his rights. The first two allegations are insufficient because they amount to no more than an allegation that Fischer was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

in a position of control at Sing Sing or in the DOCS system. Liability for a section 1983 claim cannot be based on a theory of *respondeat superior*. *Iqbal,* 129 S.Ct. at 1948. Plaintiff's third allegation that Fischer "failed to intervene to correct the errors," is the type of claim, based on the defendant's failure to act, that cannot stand in light of *Iqbal. Id.* at 1948-49. Therefore, defendant Fischer is entitled to summary judgment.

D. *Marshall*

Plaintiff alleges that Superintendent Marshall "had full knowledge of all that was [taking] place through letters that were submitted to him by the plaintiff. He had a full opportunity to go over all of the evidence and take the correct actions that should [have] been deemed appropriate, but failed to do so." (Complaint § III, ¶ 3.) This allegation, like the one made against defendant Fischer, is insufficient under *Iqbal,* because it is based on Marshall's alleged failure to act, not on his actions. *Iqbal,* 129 S.Ct. at 1948-49.

A review of the record, however, reveals that Superintendent Marshall did respond to plaintiff's letter, dated March 13, 2007. In that letter plaintiff asked Marshall to "intervene so that [plaintiff] may receive a fair and impartial hearing." (Shevlin Decl. Exh. I at RJ 97.) Plaintiff also stated that:

This misbehavior report derived from an interview that I had with Lt. Ingenito on March 10, 2007, whereas a chain of events transpired when I told him that I will write another complaint because memo's [sic] are still not being honored and harassment is continuing by said officers. I guess he did not like me telling him this, since it was my third interview on this one complaint (understandable).

(*Id.*) Marshall responded by informing plaintiff that because he had a disciplinary hearing pending, his defense should be presented to the hearing officer. (April 3, 2007 Memorandum attached in Exhibit I to the Shevlin Decl.) This response, which is an action on Marshall's part, did not deprive plaintiff of any constitutional rights. Defendant Marshall, therefore, is entitled to summary judgment.

V. *Defendant Conway*

The Complaint alleges that defendant Conway "over[saw] Attica Correctional Facility and is aware of the plaintiff being denied programs and religious material as a showing of retaliation for receiving the misbehavior report of April 11, 2007." (Complaint § III, ¶ 10.) The Court assumes that plaintiff's allegation actually refers to the March 10, 2007 Misbehavior Report, as there is no evidence of an April 11, 2007 misbehavior report. Defendant Conway is the only defendant named in this action who worked at Attica during the relevant time period. (Conway Decl. ¶ 2.) Therefore, to the extent that certain of plaintiff's claims are based on actions taken at Attica, the Court has construed those claims as being asserted against defendant Conway.

**\*17** The Complaint alleges that at Attica, "all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV.) The Complaint also alleges that at Attica, "plaintiff has been denied specific [job] programing [sic] (he was told that he could never get a job as long as he's in Attica Correctional Facility)." (Complaint § V.) Taking these allegations in a light most favorable to plaintiff, the Complaint can fairly be read to assert three claims against Conway: (1) retaliation for plaintiff's exercise of his First Amendment right to petition the government, in violation of section 1983; (2) violation of section 1983 by depriving plaintiff of his rights under the Free Exercise Clause of the First Amendment; and (3) violation of plaintiff's rights under RLUIPA.[FN7]

> FN7. Plaintiff's Complaint and other submissions do no cite RLUIPA, but I am obligated to consider the Complaint as raising the strongest argument it suggests. *Bennett,* 343 F.3d at 137.

A. *Section 1983 Claims for Retaliation and Deprivation of Free Exercise Rights*

There is no allegation or evidence that defendant Conway took any action with respect to plaintiff, other than on several occasions affirming the IGRC's denial of plaintiff's grievances. (Conway Decl. ¶¶ 3, 11, 14, 18, 22, 27, 30; Deposition of Rodney Joseph, dated September

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

10, 2008, attached as Exhibit C to the Shevlin Decl. ("Plaintiff's Dep.") at 95:21-96:9 (testifying that a draft officer confiscated his religious materials); *id.* at 105:4-9 (testifying that Sgt. Cochran issued the Second Misbehavior Report to plaintiff); *id.* at 109:20-110:14 (testifying that Mr. Roach of the Program Committee told plaintiff he would not receive a job program at Attica).) Plaintiff has not come forward with any evidence that defendant Conway had the requisite personal involvement in any of the actions that took place at Attica to support his section 1983 claim. In addition, plaintiff's claim arising from the alleged denial of the work program of his choice is conclusory and insufficient to state a claim. *See, e.g., Gill, 824 F.2d at 194-95* (affirming dismissal of a prisoner's retaliation claim based on allegations that his work assignments were changed).

B. *RLUIPA Claims*

Plaintiff alleges that at Attica, "all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV.) This allegation may fairly be read to assert claims against defendant Conway for violations of plaintiff's rights under RLUIPA. RLUIPA authorizes a private right of action and plaintiff's RLUIPA claim is separate from his section 1983 free exercise claim. 42 U.S.C. § 2000cc-2(a) ("A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.")

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person" residing in certain correctional facilities "unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA's definition of "government" includes any "State, county, municipality, or other governmental entity created under the authority of a State," "any branch, department, agency, instrumentality, or official" thereof, and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A).

**\*18** Neither the Supreme Court nor the Second Circuit, have explicitly considered whether, like section 1983, a defendant's personal involvement in the alleged "substantial burden" on the plaintiff's exercise of religion is a prerequisite to a RLUIPA claim. In *Salahuddin v. Goord,* however, the Second Circuit implicitly recognized this requirement. 467 F.3d 263, 279 (2d Cir.2006). In *Salahuddin,* the Second Circuit vacated in part the district court's grant of summary judgment in favor of several defendants on plaintiff's RLUIPA and religious freedom section 1983 claims. That court stated:

> Along with defendant Stanton, Salahuddin identifies defendants Herbert, Goord, Wright, and Eagan as responsible for this alleged violation by virtue of their denial of Salahuddin's grievance. Leaving the personal involvement of these defendants to the district court for analysis in the first instance, we vacate the judgment as to Stanton, Herbert, Goord, Wright, and Eagan on this claim.

*Id.* (internal citation omitted). Thus, at least in dictum, the Second Circuit has suggested that for an individual defendant to be liable, the individual must have "personal involvement" in the alleged wrongdoing.

Several district courts outside of the Second Circuit have concluded that personal involvement is a prerequisite under RLUIPA. *See Greenberg v. Hill,* No. 2:07-CV-1076, 2009 WL 890521, at *3 (S.D.Ohio Mar. 31, 2009) ("In order to establish liability under RLUIPA (and Section 1983), a plaintiff must prove, among other things, the personal involvement of each defendant in the alleged violation."); *Alderson v. Burnett,* No. 1:07-CV-1003, 2008 WL 4185945, at *3 (W.D.Mich. Sept. 8, 2008) ("While municipal entities can be held vicariously liable under RLUIPA, as to individual defendants, the plaintiff must demonstrate that the defendant was personally involved."); *Copenhaver v. Burnett,* No. 07-CV-14376, 2008 WL 2741807, at *3 (E.D.Mich. July 11, 2008) ("under the RLUIPA plaintiff must show that the named defendants personally imposed a substantial burden on his free exercise of religion").

*Salahuddin* recognizes that a defendant may be liable under RLUIPA for affirming the denial of a plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

grievance. 467 F.3d at 279. But, *Salahuddin* was decided before *Iqbal.* Under *Iqbal,* a government official's act of affirming the denial of a grievance that alleges the deprivation of a constitutional right, without more, is insufficient to establish that the defendant was personally involved in depriving plaintiff of that right. Although *Iqbal* addressed *Bivens* claims (and, by analogy, section 1983 claims as well), there is no reason why its reasoning should not apply with equal force to RLUIPA claims.

Based on the foregoing, I conclude that personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA. I also conclude that an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right. Plaintiff's allegations about defendant Conway, which are limited to alleging that Conway affirmed several of the IGRC's denials of his grievances, do not satisfy RLUIPA's personal involvement requirement. Therefore, defendant Conway is entitled to summary judgment on plaintiff's RLUIPA claims.

**\*19** Because defendants are entitled to summary judgment in their favor on all of plaintiff's claims, I need not address defendants' arguments regarding administrative exhaustion, qualified immunity and Eleventh Amendment immunity. To the extent that plaintiff's request that he not be subject to "retaliation in the near future for filing this claim," may be construed as a request for injunctive relief, any such threat is speculative and at this time merely hypothetical. *See O'Shea v. Littleton,* 414 U.S. 488, 494-96 (1974). To the extent that plaintiff's request that he be "transferred back to Sing Sing Correctional Facility and given back his job assignment," can be considered a request for an injunction, this request relates to his retaliation claims for which I have granted defendants summary judgment. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) ("The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief").

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted and the action is dismissed. The Clerk is directed to enter judgment for the defendants.

SO ORDERED.

S.D.N.Y.,2009.

Joseph v. Fischer
Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.